## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| **BANK OF AMERICA, N.A.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. _____ |
| | : | |
| **LEVERING RUSSELL CARTWRIGHT,** | : | |
| **JASON A. CICHOWICZ,** | : | |
| **ERIN ANNE (CARTWRIGHT) REDHEAD,** | : | |
| **and CHARLES CARTWRIGHT,** | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT FOR DECLARATORY JUDGMENT, INSTRUCTION AND INDEMNITY

Plaintiff, Bank of America, N.A. ("BANA"), by counsel, files this Complaint for Declaratory Judgment, Instruction and Indemnity against Defendants, Levering Russell Cartwright, Jason A. Cichowicz, Erin Anne Cartwright, aka Anne Redhead, and Charles Cartwright, and states the following in support thereof:

### NATURE OF THE ACTION

1.      This is a declaratory judgment action brought in accordance with 28 U.S.C. §§ 2201 and 2202.  BANA seeks a determination of the parties' rights, duties, and obligations pursuant to Defendant, Levering Russell Cartwright's ("Mr. Cartwright") instructions to transfer the assets of the Levering Russell Cartwright 1993-2 Trust (the "Trust") to Defendant, Jason A. Cichowicz ("Mr. Cichowicz").

1

2.      BANA is a neutral custodian of the assets of the Trust and is exposed to risk of immediate harm, claims and future action if it distributes funds pursuant to Mr. Cartwright's pending instructions.

3.      BANA has reason to believe that Mr. Cartwright is a financially vulnerable adult, and that Mr. Cartwright's instructions to transfer the assets of the Trust to Mr. Cichowicz are not in Mr. Cartwright's best interest.

4.      Mr. Cartwright's children, Anne Redhead and Charles Cartwright, have been named as Defendants to answer as to their respective interests, if any, as to the assets of the Trust and the instructions to transfer the assets to Mr. Cichowicz.

5.      BANA files this Complaint seeking declaratory judgment, instruction and indemnity:

a.   for BANA's transfer the assets of the Trust to Mr. Cichowicz pursuant to Mr. Cartwright's instructions; or,

b.   for BANA's denial of transfer the Trust assets to Mr. Cichowicz; and,

c.   for appointment of an independent financial or other legal representative for Mr. Cartwright from whom BANA may properly receive instructions for the financial accounts of and related to Mr. Cartwright, the Trust, the irrevocable trusts to which Mr. Cartwright is a beneficiary, and the Foundation (as later defined).

**THE PARTIES**

6.      BANA is a national bank with its main office located at 100 North Tryon Street, Charlotte, North Carolina 28255.

2

7.     Upon information and belief, Defendant Levering Russell Cartwright is an individual residing in St. Joseph County, Indiana.

8.     Upon information and belief, Defendant Jason A. Cichowicz is an individual residing in St. Joseph County, Indiana.

9.     Upon information and belief, Defendant Anne Redhead, Mr. Cartwright's daughter, is an individual residing in the State of New York.

10.    Upon information and belief, Defendant Charles Cartwright, Mr. Cartwright's son, is an individual residing in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

11.    This is an action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

12.    An actual justiciable controversy exists within the meaning of 28 U.S.C. § 2201.

13.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the suit is between citizens of different states.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## FACTUAL BACKGROUND

15.    Mr. Cartwright is 81 years old and resides in an assisted living facility.

16.    Mr. Cartwright is the settlor and trustee of the Trust.

17.    BANA is the custodian of the Trust's assets pursuant to an Investment Services Agreement and accompanying Terms and Conditions, which are attached as Exhibit A.

18.     The Trust holds approximately $6,675,000.00 in assets, which, upon information and belief, constitutes substantially all of Mr. Cartwright's liquid assets.

19.     Upon information and belief, Mr. Cartwright met Mr. Cichowicz, 42 years old, in or about 2014 or 2015, when Mr. Cartwright engaged Mr. Cichowicz, who was a practicing attorney at the time, to represent him in a legal matter.

20.     Upon information and belief, Mr. Cartwright and Mr. Cichowicz became friends, and Mr. Cichowicz would visit Mr. Cartwright socially and help him with day-to-day needs.

21.     Upon information and belief, Mr. Cartwright is somewhat estranged from his children and has no other close family.

22.     In or about February 2015, Mr. Cartwright appointed Mr. Cichowicz as co-trustee of the Cartwright Foundation, a private charitable foundation established by Mr. Cartwright's father, and holds approximately $1,300,000.00 in assets (the "Foundation").

23.     Mr. Cartwright subsequently resigned as trustee of the Foundation, leaving Mr. Cichowicz as sole trustee.

24.     In 2018, Mr. Cichowicz was elected Judge for St. Joseph County, Indiana Probate Court and, subsequently, spent approximately $165,000.00 of the Foundation's assets on improvements to the St. Joseph County Courthouse.

25.     In or about October 2015, Mr. Cartwright conveyed by quitclaim deed, a residence to himself and Mr. Cichowicz, as joint tenants with rights of survivorship.  Mr. Cichowicz is identified as the preparer of the quitclaim deed.

26.     In or about 2017, Mr. Cichowicz conveyed by quitclaim deed, his interest in the residence back to Mr. Cartwright.  Mr. Cichowicz is also identified as the preparer of this quitclaim deed.

4

27.     In or about April 2016, Mr. Cartwright added Mr. Cichowicz as a co-owner of his personal checking account, naming Mr. Cichowicz as a Joint Owner With Rights of Survivorship. Mr. Cartwright's annual income from one or more irrevocable trusts created by Mr. Cartwright's parents, totals approximately $450,000.00, which is deposited into this personal checking account and substantially expended each year.

28.     Mr. Cartwright's children, Anne Redhead and Charles Cartwright, are the presumptive remainder beneficiaries of the irrevocable trusts created by Mr. Cartwright's parents.

29.     In or about June 2016, Mr. Cartwright restated the Trust to name Mr. Cichowicz as both beneficiary and successor trustee ("2016 Trust Restatement").  Mr. Cichowicz sent the executed 2016 Trust Restatement documents to BANA.  The 2016 Trust Restatement is attached as Exhibit B.

30.     In or about June 2018, Mr. Cartwright again restated the Trust to add Mr. Cichowicz's wife and children as additional remainder beneficiaries of the Trust ("2018 Trust Restatement").  The 2018 Trust Restatement is attached as Exhibit C.

31.     In or about January 2018, Mr. Cichowicz prepared a Power of Attorney for Mr. Cartwright naming Mr. Cichowicz as attorney-in-fact and giving himself broad powers over Mr. Cartwright's assets, including power over the Trust ("Power of Attorney").  The Power of Attorney is attached as Exhibit D.  Mr. Cichowicz, in fact, regularly exercises his authority as attorney-in-fact under the Power of Attorney, writes checks on Mr. Cartwright's personal checking account, and otherwise communicates with BANA with respect to the Trust assets and cash distributions from Trust assets to Mr. Cartwright's personal checking account.

32.     In or about June 2019, Mr. Cartwright made a gift of stock from the Trust to Mr. Cichowicz valued at approximately $29,752.00 ("Stock Gift").

33.     Upon information and belief, Mr. Cartwright signed the letter directing the 2019 Stock Gift, but the return address on the letter was Mr. Cichowicz's home address.

34.     In or about October 2019, Mr. Cartwright named Mr. Cichowicz as the beneficiary of Mr. Cartwright's Trusteed IRA, which holds assets valued at approximately $357,000.00.  Mr. Cartwright also named Mr. Cichowicz's spouse as the contingent beneficiary.

35.     In or about 2020, Mr. Cartwright began telling BANA that he wanted to transfer all of the assets in the Trust to Mr. Cichowicz.

36.     BANA has attempted to dissuade Mr. Cartwright from giving away all of the assets in the Trust, particularly because the Trust constitutes substantially all of Mr. Cartwright's liquid assets.

37.     Mr. Cartwright has responded to BANA's attempts to dissuade him from transferring the Trust assets to Mr. Cichowicz by assuring BANA that "Jason [Cichowicz] will take care of me."

38.     BANA received a direction letter and transfer instructions to transfer all of the Trust assets to Mr. Cichowicz's separate, personal investment account with LPL Financial Company, on or about December 23, 2020.   The direction letter and transfer instructions (together, the "Instructions") are attached hereto as Exhibit E.

39.     The Trust's assets serve as collateral for a line of credit extended to Mr. Cartwright by BANA (the "Line of Credit").   Pursuant to the agreement governing the Line of Credit, any outstanding balance owed on the Line of Credit is required to be satisfied before the Trust's assets serving as collateral could be transferred away from BANA.  In December 2020 the Line of Credit had an outstanding balance of $1,700,000.00.

40.     In or about December 2020, the Line of Credit was repaid from, on information and belief, the proceeds of a separate loan obtained by Mr. Cichowicz from a third party financial institution (the "Cichowicz Loan"). BANA was not advised that the Line of Credit would be repaid, and did not receive a request for a payoff amount, prior to receiving this payment.

41.     During 2021, checks have been drawn on Mr. Cartwright's personal checking account in the sum of $16,106.67, each signed by Mr. Cichowicz, and made payable to the financial institution that extended the Cichowicz Loan. Upon information and belief, these checks have been negotiated as loan payments on the Cichowicz Loan.

42.     In or about 2020, Mr. Cartwright was the victim of an unrelated financial fraud when he entrusted his credit card to acquaintances who used it to make thousands of dollars of unauthorized purchases.

43.     BANA has reason to believe the Instructions are not in Mr. Cartwright's best interest, given the circumstances surrounding Mr. Cartwright's request to give away substantially all of his liquid assets to Mr. Cichowicz.

44.     BANA is aware that certain presumptions of law exist concerning undue influence related to transactions between persons in a confidential relationship.  Given that an attorney-client relationship existed between Mr. Cichowicz and Mr. Cartwright at the time some of the foregoing transactions occurred, BANA, in an abundance of caution to protect Mr. Cartwright's interests, seeks this direction from the Court.

45.     BANA intends to move this Court for the appointment of an independent financial or other legal representative to represent Mr. Cartwright's interests with respect to this action pursuant to Federal Rule of Civil Procedure 17(c)(2).

46.     BANA files this Declaratory Judgment Complaint requesting, *inter alia*, that this Court determine whether BANA should transfer the Trust assets to Mr. Cichowicz pursuant to the Instructions.

## CAUSE OF ACTION
### (Declaratory Judgment)

47.     The allegations in Paragraphs 1-46 above are incorporated by reference as though fully set forth herein.

48.     Actual and genuine controversies, disputes, and uncertainties currently exist between BANA and Defendants with respect to whether BANA should transfer the assets of the Trust to Mr. Cichowicz in accordance with the Instructions.

49.     As a result of these controversies, disputes, and uncertainties, BANA faces substantial uncertainty in determining its obligations with respect to carrying out the Instructions.

50.     As a result of these controversies, disputes, and uncertainties, BANA also faces substantial uncertainty in determining its obligations with respect to carrying out future instructions with respect to the Trust.

51.     Declaratory relief is necessary to resolve the relative rights and obligations of the parties with respect to the Trust, as to whether BANA should transfer the Trust assets to Mr. Cichowicz pursuant to the Instructions, and as to how BANA should handle other instructions from Mr. Cartwright and/or Mr. Cichowicz,

52.     BANA desires to act in Mr. Cartwright's best interest at the direction of the Court.

53.     BANA, pursuant to the Investment Services Agreement, is entitled to the recovery of attorneys' fees and costs from the Trust, for these claims based on its reasonable belief that a dispute exists as to control and proper disposition of the Trust assets, and to act in good faith to

protect Mr. Cartwright's assets by filing this Declaratory Judgment Complaint. *See* Exhibit A, Terms and Conditions of Investment Services Agreement at 22 ("If the Bank believes there is a dispute over the control or ownership of the Account Assets or the Account . . . . [t]he Bank may petition any court for instructions or other relief at the expense of the Account and the Owner, including the Bank's attorney's fees and expenses."); *Id.* at 24 (indemnifying BANA "from and against any claim, liability, loss, damage or expense (including legal fees and expenses . . .) of any nature, directly or indirectly arising out of or relating to any act or omission pursuant to this Agreement . . .").

WHEREFORE, BANA respectfully requests that the Court enter judgment:

A.    Declaring the respective rights and obligations of the parties pursuant to the Trust, specifically declaring that BANA should transfer the Trust assets to Mr. Cichowicz in accordance with the Instructions; or,

B.    Declaring that BANA should not transfer the Trust assets to Mr. Cichowicz in accordance with the Instructions; and,

C.    Appointing an independent financial or other legal representative for Mr. Cartwright from whom BANA may properly receive instructions and requests with respect to the financial accounts of and related to Mr. Cartwright, the Trust, any irrevocable trust of which Mr. Cartwright is a beneficiary, and the Foundation; and,

D.    Discharging BANA from any liability to the Defendants; and,

E.    Awarding BANA judgment for recovery its attorneys' fees and costs from the Trust assets; and

F.     Awarding BANA such other, further and different relief as the Court may deem

just and proper.

Dated:  March 12, 2021

Respectfully submitted,

**LEWIS & KAPPES, P. C.**

/s/ *Tammy L. Ortman*
Tammy L. Ortman, Atty. No. 25041-30
One American Square, Suite 2500
Indianapolis, Indiana 46282
P: (317) 639-1210
F: (317) 639-4882
E: tortman@lewis-kappes.com

**CREMER & CREMER, P. C.**

/s/ *John A. Cremer*
John A. Cremer, Atty. No. 14806-49
9993 Allisonville Road
Fishers, Indiana  46038
P:  (317) 636-8182
F:  (317) 636-8199
E:  john@indylaw.com
*Attorneys for Bank of America, N. A.*

# EXHIBIT A

**Domain: Trust Services**
**File Type: Legal**
**Doc Type: Account Setup / New Business**
**Account Number:** ▮▮▮▮▮▮▮
**Submitted By:BARBARA BRENNAN**
**Number of Pages (Including CoverSheet):10**



**BID { 1105974 }**

### Index Fields

| | | | |
|---|---|---|---|
| Customer Name: | LEVERING RUSSELL CARTWRIGHT 1993-1 | Document Date: | 09/27/2009 |
| Priority: | 1 | Doc Description: | iNVESTMENT SERVICES AGREEMENT ADVISORY ACCOUNT |



**Please Fax to: 804-205-3028**

**Bank of America** 

**Private Bank**
**Investment Services Agreement**
**Investment Advisory Account**

| ACCOUNT NAME: |  |
|---|---|
| Levering Russell Cartwright 1993 J Trust | |
| ACCOUNT NUMBER: | ACCOUNT TAXPAYER ID/SSN: |

The Owner appoints Bank of America, N.A. (the "Bank") to provide services for the Account established under this Investment Services Agreement. The Terms of Investment Services Agreement booklet (the "Booklet"), any exhibits provided to the Owner, and any amendments or revisions, are part of this Investment Services Agreement. These documents are collectively referred to as the "Agreement". The "Account Assets" includes property held by the Bank in the Account, and other property later added to the Account. The term "Owner" shall mean the individual(s) or entity(ies) entering into this Agreement with the Bank.

If the Account is in the names of two or more Owners, except as expressly provided in this Agreement, each Owner agrees that the Bank is authorized to follow the directions of **each Owner acting alone** for all purposes under this Agreement.

**1.    TYPE OF INVESTMENT SERVICES:** Investment Advisory Account (as described in the Booklet)

**2.    ACCOUNT OWNER:** (please select one)

☐ Individual      ☑ Trust      ☐ Corporation      ☐ Partnership

☐ Other (specify)  _____

**3.    FORM OF ACCOUNT OWNERSHIP FOR INDIVIDUAL ACCOUNT:** (please select one only if "individual" is selected above)

The Bank does not give legal or tax advice. Owners are advised to consult with their legal advisor prior to declaring the character of property contributed to the Account and selecting the form of Account ownership because it may have significant tax and property implications.

☑ Sole Owner    ☐ Community Property*    ☐ Separate Property*

☐ Joint Tenants with Right of Survivorship    ☐ Other (specify)**  _____

\* "Community Property" and "Separate Property" are generally available only for property acquired in one of the following states – Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin. These forms of ownership have significant tax and property consequences – SEE YOUR LEGAL OR TAX ADVISOR.

\*\* If "Tenants in Common" is selected, each Owner represents that their ownership interests in the Account are equal at all times.

**4.    DISCLOSURE OF SHAREHOLDER INFORMATION:**

A Securities and Exchange Commission rule requires the Bank to disclose the identity, address and share position of each person who has the power to control voting of securities to the issuer companies who request this information, unless Owner or Owner's representative, if Owner appoints one, directs the Bank not to do so. This information will be used by the companies to communicate directly with Owner.

The Bank ☐ is  ☒ is not  authorized to release my/our name and address, or that of my/our representative, or my/our share positions in the Account to issuer companies who request such information.



**Bank of America**

Investment Services Agreement

5.    INVESTMENT OBJECTIVE – Please select one as described in Exhibit A - check the appropriate box:

| Principal Preservation | All Fixed Income | Current Income | Balanced Income | Balanced | Balanced Return | Balanced Appreciation | Appreciation | All Equity |
|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| More Conservative | | | | | | | | More Aggressive |
| Potentially less investment risk and more inflation risk | | | | | Potentially more investment risk and less inflation risk | | | |

If the investment objective is not determined at the time of this Agreement, Owner agrees that it will provide an investment objective statement to Bank. If Owner does not provide its investment objective to Bank in writing, Owner agrees to the investment objective appearing on Owner's periodic statements unless Owner expressly notifies Bank otherwise.

The strategy marked above has been selected for this account. This investment strategy selection is not contractual and no guarantee, oral or written, has been made as to the achievement of investment objectives. All investments are associated with some degree of risk, and therefore, the value of any investment might decline.

6.    DIRECT DEPOSIT AUTHORIZATION

Depository Account information:

| | | | |
|---|---|---|---|
| DEPOSITORY NAME: (print)<br>BANK OF AMERICA | | | |
| BRANCH: | | | |
| ADDRESS:<br>231 S. LASALLE STREET | | | |
| CITY:<br>CHICAGO | STATE:<br>IL | ZIP CODE:<br>60697 | |
| BANK TRANSIT/ABA NUMBER: | | ACCOUNT NUMBER: | |
| ACCOUNT OWNER'S NAME: (print)<br>L. RUSSELL CARTWRIGHT | | | |
| SOCIAL SECURITY NUMBER: | | | |
| DIRECT DEPOSIT AUTHORIZATION (select one)   ☑ Yes   ☐ No | | | |
| I/We hereby authorize Bank of America N.A., to initiate credit entries and, if necessary, debit entries and adjustments for any credit entries made in error to my/our ☑ Checking ☐ Savings account indicated above and the named depository to credit the same to such account. | | | |

7.    INVESTMENT SERVICES AGREEMENT:

By signing below, Owner certifies that:

Owner has received, read, understood and agreed to this Investment Services Agreement, the Terms of Investment Services Agreement booklet dated 1/2007, Exhibit A, and any exhibits which together make up the provisions of this Investment Services Agreement.

Owner has specifically agreed to the Jury Trial Waiver and Class Action Waiver described in the Terms of Investment Services Agreement booklet at Article XIII or Article XIV, as appropriate.

Regardless of anything to the contrary in the Terms of the Investment Services Agreement Booklet, for purposes of defining the term "Funds," mutual funds are securities of an open-end or closed-end management investment trust or management company either registered under the Investment Company Act of 1940, as amended or regulated under the laws of any foreign jurisdiction.

If Owner is opening an Investment Management Account, by executing this Agreement below Owner acknowledges receipt of a Fee Disclosure Statement for Columbia Funds (the "Funds"), and further acknowledges that he or she has read, understood and approves the



**Bank of America**

Investment Services Agreement

**Fee Disclosure Statement.** Owner also acknowledges that he or she has received the current prospectuses for the Funds in which the Account will initially invest.

Owner is aware and acknowledges that investment in Columbia Funds and other mutual funds are not deposits or obligations of, or guaranteed by, Bank of America Corporation or any of its affiliates and are not insured by the FDIC or any government agency. Investments in mutual funds involve investment risks, including possible loss of principal. For more complete information about the Columbia Funds, including charges and expenses, please see a prospectus.

All financial institutions are required by Federal law to obtain, verify and record information that identifies each customer who opens an account. When you open an account with us, we will ask you for your name, address and other information that will allow us to identify you, such as photo identification, taxpayer identification number and date of birth.

L. RUSSELL CARTWRIGHT 1993. TRUST

NAME OF TRUST, ESTATE, GUARDIANSHIP, ETC.                                                   TAXPAYER ID NUMBER

BY: _____ TRUSTEE            09/26/07
     FIDUCIARY SIGNATURE                 (please designate TRUSTEE, PERSONAL       DATE
                                  REPRESENTATIVE, GUARDIAN, ETC.)

BY: _____
     FIDUCIARY SIGNATURE                 (please designate TRUSTEE, PERSONAL       DATE
                                  REPRESENTATIVE, GUARDIAN, ETC.)

BY: _____
     FIDUCIARY SIGNATURE                 (please designate TRUSTEE, PERSONAL       DATE
                                  REPRESENTATIVE, GUARDIAN, ETC.)

**BANK OF AMERICA, N.A.**

_Jennifer Martay_           _[signature]_           9/27/07
AUTHORIZED OFFICER (print name)           SIGNATURE              DATE

If any Owner is a U.S. person, such Owner should sign and date the certification statements in the box below.
If any Owner is a foreign person, such Owner should complete the appropriate Form W-8.

---

**Taxpayer Identification Number and Backup Withholding Certifications**

Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).
Note: You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

Owner: _____           Date: _09/26/07_

---

DISTRIBUTION: Original – Administration Vault File; Copy – Administration File; Copy - Client; Copy – Portfolio Manager; Copy – Sales .



**Bank of America**

**Private Bank**
**Investment Services Agreement – Exhibit A**

## EXHIBIT A

**Investment Objectives Defined**
**Blended Strategies**

### Current Income
Primary Goal: Income
Secondary Goal: Appreciation
   The primary goal of this strategy strives to maximize current income through a 70% to 90% allocation to primarily high-quality, intermediate-term fixed-income securities. A modest allocation to equities in the range of 10% to 30% offers a modest potential for capital appreciation.

### Balanced Income
Primary Goal: Current Income
Secondary Goal: Appreciation
   This strategy emphasizes current income through a 55% to 75% allocation to fixed-income securities, complemented by a secondary consideration for capital appreciation through an equity allocation in the range of 25% to 45%.

### Balanced
Primary Goal: Appreciation
Secondary Goal: Current Income
   This balanced approach is designed to offer the potential for both capital appreciation and current income through a 40% to 60% allocation to equities and 40% to 60% allocation to fixed-income securities.

### Balanced Return
Primary Goal: Appreciation
Secondary Goal: Growth of Income
   This strategy is intended to provide long-term total return opportunities through an allocation to both equities and fixed-income investments. The objective is represented by an allocation to equities between 50% and 70% and in fixed-income from 30% to 50%.

### Balanced Appreciation
Primary Goal: Appreciation
Secondary Goal: Growth of Income
   The principal goal of this strategy is to maximize long-term total returns through a focus on capital appreciation. As such, current income is of secondary importance. The asset allocation range for portfolios managed in this style is 60% to 80% in equities and 20% to 40% in fixed-income securities.

### Appreciation
Primary Goal: Appreciation
Secondary Goal: Growth of Income
   This strategy emphasizes the maximization of total return and protection against inflation. Equities will constitute 70% to 90% of a portfolio managed in this style. A modest exposure to fixed-income securities – in the range of 10% to 30% – may help to buffer short-term fluctuations in performance while providing a modest level of current income.

**Dedicated Strategies**

### Principal Preservation
Primary Goal: Maximum Safety of Principal
Secondary Goal: Current Income
   This approach emphasizes short-term cash investments. Income is moderate to low and varies as short-term interest rates change. Although there is no capital appreciation, account growth can be achieved through income accumulation and reinvestment. Protection against inflation is of little or no concern.

### All Fixed Income
Primary Goal: Current Income
Secondary Goal: Stability of Principal Value
   This approach primarily emphasizes current income generation. Due to its fixed-income nature, general stability of principal value should be obtained but is not guaranteed. Total return and risk will be affected by changes in current interest rate levels.

### All Equity
Primary Goal: Appreciation
Secondary Goal: Appreciation
   This strategy uses only equity securities and represents an aggressive strategy. Long-term growth and maximum capital appreciation are the primary goals. Income is low and risk is moderated by the use of a well-diversified equity portfolio. While the objective strives for high returns, performance can be volatile from year to year.

### All Real Estate
   This objective is intended for accounts that primarily hold real estate assets.

### All Oil and Gas
   This objective is intended for accounts that primarily hold oil and gas assets.

All Investment Objective definitions are subject to possible change in the future.



# FEE DISCLOSURE STATEMENT

## December, 2006

Columbia Management Distributors, Inc., an affiliate of Bank of America Corporation, offers a family of diversified mutual funds, the Columbia Funds (the "Funds"). The fees shown below are the fees (expressed as an annual percentage of average net assets) that may be paid to and retained by affiliates of Bank of America Corporation for investment advisory, administration and, for certain funds, shareholder services provided to the Funds specified below. Actual fees paid for such services may be less depending on waivers and/or reimbursements or other factors.

**Columbia Funds**
**Class Z Shares**

| EQUITY FUNDS | Investment | Administration |
|---|---|---|
| Domestic Funds | Advisory Fees | Fees |
| CMG Large Cap Growth Fund | 0.50% | NA |
| CMG Large Cap Value Fund | 0.50% | NA |
| CMG Mid Cap Growth Fund | 0.70% | NA |
| CMG Mid Cap Value Fund | 0.70% | NA |
| CMG S&P 500 Enhanced Index Fund | 0.25% | NA |
| CMG Small / Mid Cap Fund | 0.75% | NA |
| CMG Small Cap Growth Fund | 0.75% | NA |
| CMG Small Cap Value Fund | 0.80% | NA |
| CMG Strategic Equity Fund | 0.40% | NA |
| Columbia Acorn Fund | 0.74% | 0.05% |
| Columbia Acorn Select Fund | 0.85% | 0.05% |
| Columbia Acorn USA Fund | 0.94% | 0.05% |
| Columbia Asset Allocation Fund | 0.65% | 0.07% |
| Columbia Asset Allocation Fund II | 0.60% | 0.12% |
| Columbia Balanced Fund | 0.50% | NA |
| Columbia Common Stock Fund | 0.70% | 0.07% |
| Columbia Convertible Securities Fund | 0.65% | 0.17% |
| Columbia Disciplined Value Fund | 0.70% | 0.07% |
| Columbia Dividend Income Fund | 0.70% | 0.07% |
| Columbia Large Cap Core Fund | 0.60% | 0.17% |
| Columbia Large Cap Enhanced Core Fund | 0.35% | 0.17% |
| Columbia Large Cap Growth Fund | 0.70% | 0.07% |
| Columbia Large Cap Index Fund | 0.10% | 0.10% |

| | Investment Advisory Fees | Administration Fees |
|---|---|---|
| Columbia Large Cap Value Fund | 0.60% | 0.17% |
| Columbia Liberty Fund | 0.55% | NA |
| Columbia Marsico 21st Century Fund | 0.75% | 0.22% |
| Columbia Marsico Focused Equities Fund | 0.75% | 0.22% |
| Columbia Marsico Growth Fund | 0.75% | 0.22% |
| Columbia Mid Cap Growth Fund, Inc. | 0.82% | NA |
| Columbia Mid Cap Index Fund | 0.10% | 0.10% |
| Columbia Mid Cap Value Fund | 0.65% | 0.17% |
| Columbia Small Cap Core Fund*** | 0.75% | 0.07% |
| Columbia Small Cap Growth Fund I*** | 0.87% | NA |
| Columbia Small Cap Growth Fund II | 0.70% | 0.12% |
| Columbia Small Cap Index Fund | 0.10% | 0.10% |
| Columbia Small Cap Value Fund I | 0.80% | NA |
| Columbia Small Cap Value Fund II | 0.70% | 0.17% |
| Columbia Strategic Investor Fund, Inc. | 0.60% | 0.15% |

**International Funds**

| | | |
|---|---|---|
| CMG International Stock Fund | 0.75% | NA |
| Columbia Acorn International Fund | 1.19% | 0.05% |
| Columbia Acorn International Select Fund | 0.94% | 0.05% |
| Columbia Global Value Fund *** | 0.40%* | 0.17% |
| Columbia Greater China Fund | 0.95% | NA |
| Columbia International Stock Fund | 0.87% | NA |
| Columbia International Value Fund*** | 0.35%* | 0.22% |
| Columbia Marsico International Opportunities Fund | 0.80% | 0.22% |
| Columbia Multi-Advisor International Equity Fund** | 0.26%* | 0.17% |

**Specialty Funds**

| | | |
|---|---|---|
| Columbia Real Estate Equity Fund | 0.75% | NA |
| Columbia Technology Fund | 0.87% | NA |

**Fund of Funds****

| | | |
|---|---|---|
| Columbia Thermostat Fund | 1.29% | 0.22% |
| Columbia Life Goal Balanced Growth Fund | 1.19% | 0.22% |
| Columbia Life Goal Growth Fund | 1.19% | 0.22% |
| Columbia Life Goal Income and Growth Fund | 1.19% | 0.22% |
| Columbia Life Goal Income Fund | 1.30% | 0.45% |
| Columbia Maters Global Equity Portfolio | 1.19% | 0.22% |
| Columbia Masters Heritage Portfolio | 0.75% | 0.22% |
| Columbia Masters International Equity Portfolio | 1.19% | 0.17% |

3.05K(a)                              2

| FIXED INCOME FUNDS | Investment | Administration |
|---|---|---|
| Taxable Funds | Advisory Fees | Fees |
| CMG Core Bond Fund | 0.25% | NA |
| CMG High Yield Fund | 0.40% | NA |
| CMG Short Term Bond Fund | 0.25% | NA |
| CMG Ultra-Short Term Bond Fund | 0.25% | NA |
| Columbia Conservative High Yield Fund | 0.60% | NA |
| Columbia Core Bond Fund | 0.48% | 0.07% |
| Columbia Federal Securities Fund | 0.53% | NA |
| Columbia High Income Fund | 0.15%* | 0.23% |
| Columbia High Yield Opportunity Fund | 0.60% | NA |
| Columbia Income Fund | 0.42% | 0.15% |
| Columbia Intermediate Bond Fund | 0.35% | 0.15% |
| Columbia Short-Term Bond Fund | 0.30% | 0.14% |
| Columbia Strategic Income Fund | 0.60% | NA |
| Columbia Total Return Bond Fund | 0.40% | 0.15% |
| Columbia US Treasury Index Fund | 0.10% | 0.30% |
| | | |
| Tax Exempt Funds | | |
| Columbia California Intermediate Municipal Bond Fund | 0.40% | 0.15% |
| Columbia California Tax-Exempt Fund | 0.50% | NA |
| Columbia Connecticut Intermediate Municipal Bond Fund | 0.48% | 0.07% |
| Columbia Georgia Intermediate Municipal Bond Fund | 0.40% | 0.15% |
| Columbia High Yield Municipal Fund | 0.45% | 0.15% |
| Columbia Intermediate Municipal Bond Fund | 0.48% | 0.07% |
| Columbia Maryland Intermediate Municipal Bond Fund | 0.40% | 0.15% |
| Columbia Massachusetts Intermediate Municipal Bond Fund | 0.48% | 0.07% |
| Columbia New Jersey Intermediate Municipal Bond Fund | 0.48% | 0.07% |
| Columbia New York Intermediate Municipal Bond Fund | 0.48% | 0.07% |
| Columbia North Carolina Intermediate Municipal Bond Fund | 0.40% | 0.15% |
| Columbia Oregon Intermediate Municipal Bond Fund | 0.50% | NA |
| Columbia Rhode Island Intermediate Municipal Bond | 0.48% | 0.07% |
| Columbia Short-Term Municipal Bond Fund | 0.30% | 0.15% |
| Columbia South Carolina Intermediate Municipal Bond Fund | 0.40% | 0.15% |
| Columbia Tax-Exempt Fund | 0.55% | NA |
| Columbia Virginia Intermediate Municipal Bond Fund | 0.40% | 0.15% |

*Reflects deduction of amounts paid to sub-advisors that are not affiliated with Bank of America Corporation. The total investment advisory fee (including amounts that may be paid to and retained by non-affiliates) for High Income Fund, Global Value Fund, Multi-Advisor International Equity Fund, and International Value Fund is 0.55%, 0.90%, 0.70%, and 0.85%, respectively.
** The Multi-Advisor International Equity Fund is currently sub-advised by two sub-advisors, one of which is affiliated with Bank of America Corporation. The affiliated sub-advisor manages

approximately one-half of the fund's assets.  Based on assets as of 11/30/06, the maximum
investment advisory fee that may be retained by affiliates would be 0.26%.  If the amount of assets
managed by the affiliated sub-advisor increases, the maximum investment advisory fee that may be
retained by affiliates would also increase.
***Closed to new investors (subject to limited exceptions).
****For the Fund of Fund products mentioned above, the fee rates include direct and indirect fees
that may be retained by affiliates of Bank of America Corporation.  The indirect fees represent
investment advisory fees and administration expenses borne at the underlying fund level.

**Columbia Money Market Funds**

| Trust Class Shares | Investment Advisory Fees | Administration/ Shareholder Service Fees |
|---|---|---|
| California Tax-Exempt Reserves | 0.15% | 0.20% |
| Cash Reserves | 0.15% | 0.20% |
| Government Reserves | 0.15% | 0.20% |
| Money Market Reserves | 0.15% | 0.20% |
| Municipal Reserves | 0.15% | 0.20% |
| New York Tax-Exempt Reserves | 0.15% | 0.20% |
| Tax-Exempt Reserves | 0.15% | 0.20% |
| Treasury Reserves | 0.15% | 0.20% |

| G-trust Shares | Investment Advisory Fees | Administration/ Shareholder Service Fees |
|---|---|---|
| Connecticut Municipal Reserves | 0.15% | 0.10% |
| Massachusetts Municipal Reserves | 0.15% | 0.10% |

Columbia Management Advisors, LLC ("CMA"), an affiliate of Bank of America Corporation,
may receive compensation from the Funds for pricing and bookkeeping services.  The annual fee
for this service is computed based upon two components:  an asset based charge for fund
accounting services equal to $25,000 per fund plus 0.015% of the fund's net asset value, for fund
of funds, an asset based charge for fund accounting services equal to $13,000 per fund, $13,000
for financial reporting support services, $3,000 for fair value pricing services, and $3,000 for each
additional portfolio manager for a fund, subject to certain annual limitations.  In addition, CMA is
entitled to reimbursement for out-of-pocket expenses and internal direct costs related to fund
accounting, oversight and monitoring, budgeting and approving fund expenses.

In addition to the fees shown above, Columbia Management Services, Inc. ("CMSI"), an affiliate
of Bank of America Corporation, may receive compensation from the Funds for transfer agency
services.  The fee is computed based upon an annual charge per open account in a fund of $17.00
per open account plus sub-transfer agent fees calculated based on assets held in omnibus accounts
(including the Private Bank) subject to a cap of 0.11% of the Funds net assets represented by the
account.  CMSI is also entitled to retain all revenues for fees for wire, telephone and redemption
orders, IRA trustee agent fees, and interest and earnings credits with respect to demand deposit

accounts maintained on behalf of the Funds. CMSI is also entitled to reimbursement from the Funds for certain out-of-pocket expenses.

In addition to the fees shown above, affiliates of Bank of America Corporation may provide brokerage services to the Funds. Any commission, fee or other remuneration received for brokerage services by affiliates of Bank of America Corporation will be reasonable and fair compared to the commission, fee or other remuneration received by other brokers for comparable transactions in similar securities being purchased or sold on a securities exchange during a comparable period of time.

Unless your account is subject to an alternative fee schedule, or unless your account is a Custody Account, the Fund investment advisory fees are credited back to the account up to the amount of the account level fee. The fee paid by the account to Bank of America Corporation will not be reduced in recognition of amounts paid by the Funds for other services (such as administrative services). The account will not be charged a sales "load" for buying or redeeming Fund shares described in the Fund prospectuses.

You may request a prospectus for any Fund on-line at www.columbiafunds.com, by calling tolling free at 800-345-6611, or by simply contacting your relationship manager or portfolio manager. For California accounts, we have enclosed prospectuses for the Funds, as appropriate. The prospectuses and this Fee Disclosure Statement describe certain fees that may be paid by the Funds to affiliates of Bank of America Corporation. The maximum fees that may be paid by the Funds for investment advisory and certain other services are reviewed annually by the Funds' board of trustees and are subject to change. The prospectuses also provide other information about the Funds' investment objectives and policies. After reading this information, please feel free to contact your relationship manager or portfolio manager with any questions you may have. The Net Asset Values (NAV) of many of these Funds are published daily in The Wall Street Journal and other major newspapers and will allow you to follow the share price of your investment.

In addition to the fees listed above there are "Other Fees" not listed above that represent payments made by the funds to cover normal operating expenses. These expenses generally include, but are not limited to, transfer agency (affiliate), custody, and legal fees as well as costs related to state registration and printing of fund documents. The specific fees and expenses that make up a Fund's "Other Fees" will vary from time-to-time and may include fees or expenses not described here. For further information about Other Fees, please consult a fund prospectus.

Further information regarding fees paid by the Funds, how such fees are computed and other Fund expenses is included in the prospectuses and statements of additional information of the Funds, which can be obtained by contacting your Private Bank representative.

*Investments in Columbia Funds are not deposits or obligations of, or guaranteed by, Bank of America Corporation or any of its affiliates and are not insured by the FDIC or any government agency. Investments in mutual funds involve investment risks, including possible loss of principal.*

*For more complete information about the Columbia Funds, including charges and expenses, please see a prospectus.*

*Banking products such as checking accounts and certificates of deposit are FDIC insured and are offered through Bank of America, N.A., member FDIC.  Premier Banking and Investments is offered through Bank of America Premier Banking® and Banc of America Investment Services, Inc.®*

*Investment products such as stocks, bonds and mutual funds:*

*Are Not FDIC Insured
May Lose Value
Are Not Bank Guaranteed*

*Investment products and services may be available through a relationship managed by The Private Bank of Bank of America or through a relationship with Banc of America Investment Services, Inc. Certain Private Bank associates are registered representatives with Banc of America Investment Services, Inc. and may assist you with investment products and services provided through Banc of America Investment Services, Inc. and other nonbank investment affiliates.  Banc of America Investment Services, Inc. is a registered broker-dealer, member NASD and SIPC, and a nonbank subsidiary of Bank of America, N.A.*

*Columbia Management is the primary investment management division of Bank of America Corporation.  Columbia Management entities furnish investment management services and advise institutional and mutual fund portfolios.*

*Products may also be available through other affiliates including Banc of America Securities, LLC, (BAS).  BAS is a member of the NYSE.*

*This Booklet contains the terms and conditions under which your Investment Services Agreement will be administered.  Please review it carefully and contact the Bank with any questions you may have.*

*Rev. 01/2007*

# Table of contents

**I. Investment Services** ......................................5
- **A. Types of Investment Service** .........................5
  1. Investment Management Account ..................5
  2. Investment Advisory Account .......................5
  3. Custodial Account ...........................6
- **B. Investment Objectives** ...............................6
- **C. Investment of Cash** ..................................7
- **D. Securities Not Accompanied by a Prospectus, Fractional Shares; Par Bonds** ........................7
- **E. Transactions with the Bank and its Affiliates** ........7
  1. Selection of Brokers ..................................7
  2. Foreign Exchange Transactions .....................8
  3. Authorization to Engage in Certain Securities Transactions with Related Entities .............8
- **F. Authorization to Invest in Mutual Funds Serviced by Bank and Bank Affiliates; Mutual Fund Investment Advisory Fees and Other Compensation or Benefits Received by Bank** ....................................10
  1. Bank Authorization to Invest in Mutual Funds Serviced by Bank and Bank Affiliates .............10
  2. Bank and Bank Affiliates Authorized to Receive Compensation From the Funds and Others .......10
  3. Purchase and Sale of Securities Through Affiliates ...........................................11
  4. Disclosure Regarding Mutual Funds ...........11
- **G. Proxies** ................................................11

**II. Administrative Provisions** ..............................11
- **A. Distributions** .........................................12
- **B. Nominee and Depositories Authorized** ..............12
- **C. Employment of Agents; Document Execution** .......12
- **D. Notices, Directions and Instructions** ................12
  1. Notices ...........................................12
  2. Owner's Instructions ........................13
  3. E-Mail ......................................13
  4. Broker's DTC ID Confirmations ....................14
  5. Execution of Transactions After Owner's Inability to Act ...............................................14
- **E. Statements; Transaction Reports** ....................14
- **F. Cross Trading** ......................................15

**III. Owner's Representative** ..............................15

**IV. Account Owners** .......................................16
- **A. Individual Owners** ....................................16
  1. Sole Owner .......................................16
  2. Two or More Owners ..............................16

3

B. Owner Is Fiduciary ....................................17
C. Corporation or Partnership ...........................18
D. Determination of Incapacity and Capacity;
  Limitation of Bank's Responsibility ................18
E. Power of Attorney ....................................19
F. Owner's Representations .............................19
V. Compensation and Expenses...........................20
VI. Limitations on Service ...............................20
A. Other Clients and Advice ............................20
B. Securities of Related Entities .......................20
C. Capital Changes .....................................21
D. Stripped Coupons ....................................21
E. Variable Rate Securities ..............................21
F. Securities Subject to Options ........................21
G. Payment of Taxes; Tax Reporting; Tax Withholding .22
H. Suspension of Action ................................22
VII. Limited Responsibilities and Indemnification ....22
A. Limited Responsibilities and Liability ...............23
B. Bank's Performance and Recommendations; Bank
  Followed Securities ..................................23
C. Equity Aggregation Disclosure.......................24
D. Indemnification .............................24
VIII. Recording of Client Calls .............................25
IX. Amendment; Revocation .............................25
A. Amendment .........................................25
B. Revocation ..........................................25
X. Pledge of Assets and Waiver of Conflicts ...........26
XI. Governing Law ........................................27
XII. Attorneys' Fees .......................................27
XIII. Dispute Resolution Provision
(All States, except California) ............................27
A. General Provisions ...................................27
B. Rules of Interpretation ...............................28
XIV. Dispute Resolution Provision (California).........28
A. General Provisions ...................................28
B. Judicial Reference Provision ....................29
C. Rules of Interpretation .........................30
XV. Binding on Successors ...............................30
XVI. Construction ...........................31
XVII. Character of Property;
Form of Account Ownership .............................31
A. Character of Property and Form of Account Ownership
  May Have Significant Tax and Property
  Implications .........................................31
B. Joint Management Community Property or
  Separate Property ...................................31
C. Joint Tenants with Right of Survivorship ...........31

4

## Agreement

## I. Investment Services

### A. Types of Investment Service

Please select on the Investment Services Agreement one of the three specific types of investment service described below. The service selected will be provided until the Bank receives written notice of Owner's selection of a different service or until the Account is terminated or suspended.

### 1. Investment Management Account

The Bank shall manage the investments in Owner's account (the "Account Assets"). In its discretion, and without being obligated to give prior notice, the Bank is authorized to make such investment changes as it deems appropriate, in accordance with Owner's stated Investment Objectives. Owner may direct the Bank to make or retain specific investments and the Bank shall retain the investments until Owner directs otherwise. The Bank's responsibility with respect to those specific investments shall be limited to that of a custodian, as described below. Owner understands that directives to hold or not to hold certain investments can adversely affect the ability of the Bank to design an investment mix to achieve Owner's Investment Objectives.

### 2. Investment Advisory Account

The Bank shall make recommendations regarding Account Assets. The Bank is not required to make investment recommendations to Owner which fall outside Owner's Investment Objectives. All sales, purchases, exchanges or other transactions respecting Account Assets will be made only pursuant to Owner's directions, except as provided in Section I.C.

5

### 3. Custodial Account

The Bank will safekeep Custodial Account Assets. In a Custodial Account, the Bank does not provide investment services or recommendations and has no responsibilities with respect to the investment, quality, diversification or evaluation of the Account Assets. Unless otherwise agreed to in writing, the Bank as custodian will affirm and settle all trades placed by Owner or Owner's authorized representative; however, the Bank shall have no responsibility to accept trade orders for execution unless indemnified to the Bank's satisfaction. The affirmation and settlement of all sales, purchases, exchanges or other transactions respecting the Account Assets will be made only pursuant to Owner's direction and the Bank has no duty to act in the absence of Owner's directions, except as provided in Section I.C.

### B. Investment Objectives

If Owner has selected an Investment Management Account or an Investment Advisory Account, Owner agrees that Owner will provide the Bank with Owner's Investment Objectives. As noted on the Investment Services Agreement, if Owner does not provide its investment objective to the Bank in writing, Owner agrees to the investment objective appearing on Owner's periodic statements unless Owner expressly notifies the Bank otherwise. Investment Objectives remain in effect until Owner expressly notifies the Bank otherwise. The Bank urges Owner to revisit Owner's Investment Objectives periodically, because Owner, and not the Bank, is responsible for ensuring that Owner's Investment Objectives meet Owner's investment goals and continue to meet them during the term of this Agreement. The Bank will not be liable for any losses or reduced returns on the Account Assets which result from following Owner's Investment Objectives.

6

### C. Investment of Cash

At its discretion, the Bank will invest cash in the
Account that is (i) held for reinvestment or distribu-
tion or (ii) held as a cash balance as part of the asset
allocation in the Account, in interest bearing accounts,
certificates of deposit, commercial paper, treasury
bills, master notes, money market instruments
(including, without limitation, certificates of deposit
and interest bearing accounts of the Bank or banks
affiliated with the Bank) and in shares of money
market and other mutual funds including those for
which the Bank or any of its affiliates provides servic-
es for a fee, including, but not limited to, investment
management, advisory, custody, and shareholder
servicing. The Bank reserves the right from time to
time to change the investment for this cash compo-
nent of the Account.  There is no guarantee that the
yield on any particular cash investment will be higher
over any given period than similar investments that
may be available. The Bank derives financial benefit
from any deposits of cash held in the Account in cer-
tificates of deposit and interest bearing accounts of
the Bank or its affiliates, which benefit is in addition
to the fees assessed on the Account.

### D. Securities Not Accompanied by a Prospectus; Fractional Shares; Par Bonds

The Bank may invest in securities not accompanied by
a prospectus.  The Bank will sell all fractional shares
of stock received by it and denominations of par
bonds which cannot be issued in certificate or regis-
tered form, unless notified to the contrary by Owner.

### E. Transactions with the Bank and its Affiliates

#### 1. Selection of Brokers

The Bank is authorized as Owner's agent to
execute Owner's securities transactions through
those brokers and dealers selected by the Bank, in
its discretion.  The Bank is not responsible for any
loss incurred by reason of any act or omission of
any broker or dealer. The Bank may have transac-
tions for the Account executed by an affiliate of
the Bank ("Affiliated Brokers").  Some of these
transactions may be executed by Affiliated Brokers
using the facilities of a national securities

7

exchange. For executing such transactions,
Affiliated Brokers will receive commissions in
amounts comparable to those charged by other
broker-dealers for comparable transactions, which
would be paid out of the Account Assets. The pay-
ment of these commissions would be in addition
to, and would not offset or reduce, the fees and
expenses payable to the Bank for its handling of
the Account. In consideration for receiving com-
missions from the Account, and other accounts
managed by the Bank and its affiliates, broker-
dealers who execute transactions for the Account,
including Affiliated Brokers, may provide to the
Bank (or to affiliated or unaffiliated agents
retained by the Bank to provide investment advice)
research, product and services that will assist the
Bank or its agents in providing investment advice.
Not all of such research, product and services will
be of benefit to the Bank or its agents in managing
the accounts whose trades generated such commis-
sions, and some of such research, product and
services may benefit other accounts managed by
the Bank or its agents and affiliates.

## 2. Foreign Exchange Transactions

The Bank may execute foreign exchange transac-
tions for the Account with itself or an affiliate and
may receive its standard mark-up, which is built
into the rate of exchange. The payment of this
mark-up would be in addition to, and would not
offset or reduce, the fees and expenses payable to
the Bank for its handling of the Account.

## 3. Authorization to Engage in Certain Securities Transactions with Related Entities.

In performing investment services under this
Agreement, the Bank is authorized to select certain
entities, including its own units and its subsidiaries,
affiliates or other entities in which it or its parent
Bank of America Corporation has a direct or indi-
rect, full or partial ownership interest ("Bank
Affiliates"), to provide investment advisory or
management services to the Account and to engage
in various transactions with Bank Affiliates on
behalf of Owner's Account. Owner understands

8

and agrees that the Bank and Bank Affiliates can receive commissions, fees and other direct or indirect benefits for engaging in transactions described in this paragraph which are in addition to the fees the Bank receives for providing services under this Agreement. Pursuant to this authorization, the Bank may make purchases and sales of, and recommendations with respect to securities or other assets as it deems appropriate, including but not limited to:

a. securities (i) underwritten by the Bank or Bank Affiliates, (ii) placed by a Bank Affiliate, (iii) purchased from a Bank Affiliate even if it makes a market in that security, or (iv) purchased from members of underwriting or selling groups in which the Bank or Bank Affiliate also participates, either during the life of any securities syndicate of which the Bank or a Bank Affiliate is a member or after its close; and the Bank or Bank Affiliate shall receive the usual commission or markup earned on similar transactions;

b. purchase securities from and sell securities to Bank Affiliates as dealers in principal transactions;

c. financial instruments or other investment vehicles including, but not limited to, derivatives such as options, collars and forward sales; private investment funds, including funds organized as limited partnerships, limited liability companies or otherwise; hedge funds, private equity or venture capital funds; and other investment vehicles whether registered or otherwise (referred to collectively in the Agreement as "Alternative Investments"). Alternative Investments may include those offered, underwritten or issued by a Bank Affiliate or to which a Bank Affiliate may render services or serve as a counterparty, and from which a Bank Affiliate receives compensation.

As permitted by law, any applicable banking, securities, agency laws or regulations prohibiting and/or restricting in any way an agent from dealing with itself, or from dealing with respect to any matter in

9

which it may or does have a personal interest, do not apply to the Bank to the extent the actions of the Bank or Bank Affiliates are authorized under this paragraph, and Owner hereby waives any conflicts of interest on the part of the Bank and Bank Affiliates arising from such actions.

**F. Authorization to Invest in Mutual Funds Serviced by Bank and Bank Affiliates; Mutual Fund Investment Advisory Fees and Other Compensation or Benefits Received by Bank**

The Bank and Bank Affiliates provide a variety of services to multiple mutual funds, including but not limited to Columbia Funds (the "Funds"). Owner understands and agrees that, in addition to the compensation paid to the Bank for providing services to the Account, the Bank and Bank Affiliates may receive additional compensation as a result of investment in the Funds.

**1. Bank Authorization to Invest in Mutual Funds Serviced by Bank and Bank Affiliates**

If Owner has selected an Investment Management Account, the Bank may invest Account Assets in the Funds without prior notice to Owner. If Owner has selected an Investment Advisory Account, the Bank may recommend that Owner invest Account Assets in the Funds.

**2. Bank and Bank Affiliates Authorized to Receive Compensation from the Funds and Others**

Owner agrees that the Bank and Bank Affiliates can receive compensation and other benefits, including, but not limited to, research, product and services that will assist the Bank and Bank Affiliates in providing investment advice, for providing services to the Funds which are in addition to the fees the Bank receives for providing services to the Account. Depending on the type of investment service selected, if Owner or the Bank transfer Account Assets between the Funds, the amount of compensation or value of other benefits received by the Bank and Bank Affiliates may increase or decrease. Not all of such research, product and services will be of benefit to the Bank

10

or Bank Affiliates in managing the accounts whose trades generated such commissions, and some of such research, product and services may benefit other accounts managed by the Bank or Bank Affiliates.

### 3. Purchase and Sale of Securities Through Affiliates

To the extent permitted by applicable law, the Funds may purchase securities through or from the Bank and Bank Affiliates and may engage in repurchase transactions with the Bank and Bank Affiliates.

### 4. Disclosure Regarding Mutual Funds

Investments in Columbia Funds and other mutual funds are not deposits or obligations of, or guaranteed by, Bank of America Corporation or any of its affiliates and are not insured by the FDIC or any government agency. Investments in mutual funds involve investment risks, including possible loss of principal. For more complete information about the Columbia Funds, including charges and expenses, please see a prospectus.

## G. Proxies

For Account Assets subject to an Investment Management Account or an Investment Advisory Account the Bank may vote or refrain from voting proxies in its discretion, or the Bank may refer to Owner for voting such proxies as the Bank deems advisable. If there is more than one Owner and the Owner is to receive proxies and proxy materials, the Bank is entitled to send the proxies and proxy material to any one Owner or the Owner's authorized representative without liability.

## II. Administrative Provisions

The Bank shall have no duty to collect property to be transferred to the Account and is responsible only for property actually delivered to the Bank. The Bank may reject property not acceptable to it. The Bank has no duty to demand or seek to enforce the receipt of any property, including, without limitation, income, cash or stock dividends, or other distributions on behalf of the Account, but to the extent any are received by the Bank, they will be added to the Account as soon as practicable.

11

## A. Distributions

The Bank will distribute the Account Assets as Owner directs in accordance with this Agreement. However, the Bank will retain such cash and other Account Assets as the Bank determines to be necessary to complete any pending transactions and satisfy any account obligations, including outstanding fees or other obligations owed by Owner to the Bank or to any Bank Affiliate. If Owner has directed a fixed amount or a percentage to be distributed to Owner, the Bank will distribute income first and, if income is insufficient, it will then distribute principal.

## B. Nominee and Depositories Authorized

In order to facilitate the transfer and servicing of Account Assets, all registered securities may be held in the Bank's nominee name. Owner authorizes the Bank to sign the Owner's name and to guarantee such signature as that of the Owner, and to deliver any instrument determined by the Bank to be necessary to effect the transfer of registered securities into the name of the Bank's nominee or in book entry at security depositories or clearing house corporations, or to facilitate the collection of any payment attributable to those securities, or to effect any other necessary action relating to those securities. The Bank may also hold securities in bearer form in its own vault or with subcustodians.

## C. Employment of Agents; Document Execution

Owner authorizes the Bank to employ agents and pay their fees from the Account; and to execute and deliver any contract, instrument, certificate or document the Bank deems appropriate to perform its duties under this Agreement.

## D. Notices, Directions and Instructions

### 1. Notices

All notices to Owner may be given by personal delivery to Owner or by mailing to Owner's address last on file with the Bank. Bank may include a notice with or on a statement for Owner's Account. For Accounts with more than one Owner, the Bank may send notices to any one Owner which shall be effective for all.

12

## 2. Owner's Instructions

Except as otherwise provided in this Agreement, the Bank shall be entitled to rely on written or oral instructions from Owner or from any person the Bank in good faith believes is the Owner or some-one authorized by Owner to issue such instruc-tions. Owner shall promptly confirm in writing any oral instructions if requested by the Bank to do so. The Bank is not required to act on any instructions when the Bank in good faith doubts the validity or meaning of such instructions. Any such instruction will only be effective upon actual receipt by the Bank at the Bank's office where the Account is administered. The Bank shall have a reasonable amount of time to comply with any instruction, taking into account the time, manner and nature of the instruction. Notwithstanding any other provisions of this Agreement, the Bank's execution of oral investment directions shall be conclusively deemed approved if Owner does not object within five (5) business days following receipt of an account statement, transaction report or other confirmation from the Bank reflecting compliance with such instruction. The Bank is not required to comply with any direction which the Bank believes may subject the Bank or any Bank Affiliate to liability or expense, or to commence or defend any action, unless the Bank consents to, and is indemnified in a manner and amount satis-factory to the Bank. Owner's instructions shall continue in effect until the Bank receives notice to the contrary, unless expressly provided otherwise in this Agreement. Owner will be liable for any losses resulting from Owner's instructions to the Bank.

## 3. E-Mail

While e-mail is convenient, it is important to rec-ognize the limitations of unsecured (i.e., unprotect-ed, unencrypted) e-mail. For example, unsecured e-mail may be intercepted by unauthorized indi-viduals. Intercepted e-mails that contain personal, confidential information can result in identity theft or other fraudulent activity. An intercepted e-mail can be altered without detection by either the

sender or the recipient. Additionally, there is no guarantee that the originator of the message is truly the originator noted in the e-mail. Nevertheless, Owner may find that e-mail may be appropriate in many instances and choose to communicate with the Bank by unsecured e-mail and direct the Bank to communicate with Owner by unsecured e-mail. The Bank is not responsible or liable to Owner or any other person if any e-mail containing personally identifiable information is intercepted or altered. The Bank may, without liability, assume that any e-mail received that purports to be from Owner is genuine.

### 4. Broker's DTC ID confirmations

Owner's investment directions, if any, under this Agreement shall be confirmed by a broker's DTC ID confirmation if effected by Owner or Owner's representative through the DTC ID or comparable system.

### 5. Execution of Transactions After Owner's Inability to Act

The Bank is protected in relying on instructions from Owner or a representative of Owner until it receives notice of the inability of that person or entity to act under this Agreement (e.g., notice of the Owner's or representative's death, incapacity, termination of authority or existence) and has had a reasonable time to act on such notice, including seeking confirmation thereof, taking into account the time, manner, nature and place of receipt of the notice. The Bank will execute the instructions and the Bank's actions will be valid and binding upon all Owners and their heirs, successors and assigns and, if Owner is a fiduciary entity, upon its successors, assigns, successor fiduciaries and its beneficiaries.

### E. Statements; Transaction Reports

The Bank will send Owner periodic statements covering the Account's securities and other transactions, and Owner agrees that the periodic statements are acceptable as confirmation of these transactions. Owner understands that if Owner retains investment discretion Owner is entitled to receive transaction

14

reports at or before completion of the transaction if the Bank uses its own form or, if the Bank uses a broker-dealer's confirmation, within one business day from the Bank's receipt thereof, and Owner agrees to waive this right. It is Owner's responsibility to examine such statements and promptly report any objection, disagreement or irregularity with any matter disclosed therein. Within thirty (30) days after receiving a transaction report, periodic statement, or other written document disclosing a matter, Owner must notify the Bank in writing of any objection or irregularity. If Owner does not provide written notification as provided in this Agreement, Owner agrees that all such reports, statements and matters shall be conclusively deemed approved and all rights to assert such objection, disagreement or irregularity are waived. The earlier of the date Owner actually receives a transaction report or statement or the date which is five (5) business days after the Bank mails the transaction report or statement is to be deemed Owner's date of receipt for purposes of this paragraph.

### F. Cross Trading

Owner authorizes the Bank and Bank Affiliates to effect transactions for the Account with other accounts for which the Bank or Bank Affiliates provide investment services, including accounts where the Bank serves as trustee ("Cross Trades"). Neither the Bank nor Bank Affiliates will receive any additional compensation for effecting such Cross Trades. Owner agrees that Cross Trades shall not constitute a violation of any duty of loyalty, and waives any conflicts of interest or self-dealing on the part of the Bank and Bank Affiliates arising from Cross Trades.

## III. Owner's Representative

Owner may designate in writing a representative who is authorized to direct the Bank with respect to all matters, but distribution may be directed only to Owner or to an account designated by Owner. The Bank will incur no liability for acting in accordance with Owner's representative's directions and all actions taken or withheld by the Bank pursuant to such directions are binding on Owner. The Bank conclusively presumes that Owner's represen-

15

tative is empowered to act until the Bank receives written notice from Owner that Owner's representative's services have been changed or terminated.

## IV. Account Owners

### A. Individual Owners

#### 1. Sole Owner

Unless otherwise provided in this Agreement, upon receipt of written notice of Owner's incapacity (determined as provided below) or death, the Bank will cease providing investment services and will provide only custody services. Upon receipt of written notice of Owner's death, the Bank will distribute the Account Assets to the personal representative of Owner's estate as soon as practicable after payment of the Account's obligations, if any.

#### 2. Two or More Owners

(a) Except as expressly provided in this Agreement, if the Account is in the names of two or more individuals, each agrees that the Bank is authorized to follow the directions of each Owner acting alone for all purposes under this Agreement. Each Owner has authority to receive materials and communications of every kind relating to the Account; and generally to deal with the Bank as fully and completely as if each Owner were the sole Owner of the Account, without notice to any other Account Owner. Any Owner may direct distributions or withdrawals of Account Assets, and the Bank may, in its discretion, make the distributions jointly to all Owners, or to the directing Owner. The Bank will not be liable for acting in accordance with the directions of any one Owner and all actions taken or withheld by the Bank pursuant to those directions are binding on all Owners and their respective heirs, successors and assigns. In the event the Bank receives inconsistent directions from two or more Owners, the Bank may hold the Account Assets and take no further action until it receives the same directions from all Owners or directions from a court of competent jurisdiction at the Owners' entire cost and expense, including the Bank's attorney's fees.

16

(b) In the event of the incapacity of one or more individual Owners, the Account shall not terminate and the Bank is authorized to follow the directions of one or more of those Owners who are not incapacitated. The Bank will not be liable for acting in accordance with those directions and all actions taken or withheld by the Bank pursuant to those directions will be binding on all Owners. Upon receipt of written notice of the incapacity of all Owners, the Bank will provide only custody services.

(c) Upon receipt of written notice acceptable to the Bank of the death of one or more individual Owners the Bank will cease providing investment services with respect to that portion of the Account Assets determined to belong to the decedent, if any, and will provide only custody services, and will distribute any Account Assets determined to belong to the decedent (or as otherwise required by law) to the personal representative of the decedent's estate as soon as practicable after payment of any Account's obligations. The Bank will continue to act on the instructions of any one of the surviving Owners with respect to the remainder of Account Assets

### B. Owner Is Fiduciary

If the signatories to this Agreement enter into it in a fiduciary capacity on behalf of an estate, trust, guardianship or conservatorship (the "fiduciary entity"), the Bank shall have no responsibility with respect to the management or administration of the fiduciary entity other than as expressly set forth in this Agreement. The fiduciary, and each of them if there are multiple fiduciaries, agree it is the fiduciary's responsibility to comply with the terms of the governing fiduciary instrument, court order and/or applicable law with respect to the management, administration, and investment of the fiduciary entity, as well as the number of fiduciaries required to exercise trust powers and/or bind the fiduciary entity. Accordingly, the Bank may rely upon the direction of any one fiduciary as representing the agreement of all

17

fiduciaries necessary to bind the fiduciary entity and the Bank is released from any liability which may result from following such direction. If, at any time, the Bank believes that no fiduciary is then serving on behalf of the fiduciary entity, the Bank will cease providing investment services and will provide only custody services until the Bank has received notice and satisfactory evidence that one or more successor fiduciaries have been duly appointed and agree to adopt this Agreement. Any successor fiduciary's use of any Bank services in connection with the Account shall constitute his or her acceptance and adoption of this Agreement. The Bank is entitled to rely on the provisions of this Agreement and any current trustee certification or representation until it receives written notice of a change at the office where this Account is administered.

### C. Corporation or Partnership

If Owner is a corporation, partnership or other entity and the Bank has begun to carry out Owner's instructions before the Bank receives written notice of the termination of Owner's existence, the Bank will execute the instructions and its actions will be valid and binding upon Owner and its successors and assigns. Thereafter, the Bank will cease providing investment services and will provide only custody services until Account Assets are distributed to a representative as authorized by documentation acceptable to the Bank or by court order.

### D. Determination of Incapacity and Capacity; Limitation of Bank's Responsibility

The Bank is entitled to act on written communication from a licensed physician that an individual is unable to manage his or her financial affairs by reason of mental or physical incapacity or a judicial determination or the appointment of a guardian, conservator, or personal representative of the individual's estate or person. Prior to actual notice of incapacity as described above the Bank has no duty to investigate an individual's incapacity, and is not liable for any action or inaction taken at that individual's direction. The Bank is entitled to rely upon written communication from a licensed physician that the individual is

18

able to manage his or her financial affairs and/or a judicial determination that an individual has been restored to full capacity under this Agreement.

### E. Power of Attorney

If Owner is a sole individual, an attorney-in-fact may exercise Owner's rights and powers in this Agreement to the extent permitted by law and the terms of the power of attorney. The Bank may act on instructions from the attorney-in-fact without liability. The Bank may refuse to honor the power of attorney with or without cause and with no liability for such refusal. The Bank may restrict the types or sizes of transactions executed by an attorney-in-fact. The Bank is protected in relying on a sworn statement by the attorney-in-fact or as otherwise provided by law that the power remains in full force and effect, until the Bank receives written notice of revocation from Owner and has had a reasonable time to act upon it.

### F. Owner's Representations

If Owner is an individual, Owner represents and warrants to the Bank that Owner has full power and authority to enter into this Agreement and to exercise control over the Account Assets. If Owner is a corporation, partnership, or other entity, the signatories represent and warrant on behalf of such entity that this Agreement has been duly authorized by that entity and that the signatories have full power and authority to act for the entity. Any designation or change in the authorized signatories must be supported by documentation acceptable to the Bank. If Owner is acting in a fiduciary capacity, Owner represents and warrants to the Bank that Owner is duly appointed, qualified and acting in such capacity and has full power and authority to enter into this Agreement. Owner indemnifies and holds harmless the Bank from and against any liability, claim, loss or expense that the Bank may incur as a result of the Bank's acting in reliance upon these representations and warranties and Owner agrees that it will immediately notify the Bank of anything which affects these representations or warranties.

## V. Compensation and Expenses

Owner agrees to pay the Bank for its services in the amounts as set forth in the Bank's schedule of fees and

expenses for this type of Account in effect at the time services are rendered. All expenses and costs and all amounts due to the Bank or any Bank Affiliate under this Agreement shall be charged to and paid from the Account or from the sale of Account Assets chosen by the Bank. If the Account is subject to legal process, the Bank may charge a reasonable fee to comply with such process, which may include the Bank's legal fees.

## VI. Limitations on Services

The Bank's responsibilities under this Agreement are subject to the following limitations and conditions:

### A. Other Clients and Advice

The Bank provides individualized investment advice to its clients. Owner acknowledges that the Bank and Bank Affiliates provide investment services to other clients and may give advice to them, or manage their Accounts, in ways which may differ from the advice given to Owner. Owner agrees that the Bank is not obligated to recommend to or purchase for Owner any securities or other investments which it may purchase or sell for itself or for any other clients. Also, Bank Affiliates may from time to time have long or short positions and buy or sell securities of issuers whose securities are the subject of the Account's transactions. The Bank does not give legal advice and recommends Owner consult Owner's legal and tax advisors (other than the Bank) before signing or taking any action under this Agreement.

### B. Securities of Related Entities

The Bank is authorized to retain any securities of Bank of America Corporation, or any affiliated company and their respective successors, which Owner has contributed to the Account or Owner has directed the Bank to acquire. The Bank, however, shall have no responsibility to make recommendations or decisions regarding whether to purchase, sell or retain securities of Bank of America Corporation, or any Bank Affiliates and their respective successors.

### C. Capital Changes

The Bank will effect redemptions of securities in accordance with its policies and procedures in effect from time to time. If information concerning any div-

20

idend, record or payment date of any distribution, any call or other capital changes or information requiring special action is not published at least ten (10) business days before any such event in the reporting services or publications utilized by the Bank, the Bank will not be liable for its failure to take action. Owner is responsible for knowing the rights, obligations, basis, value, and other terms of Account Assets purchased or held at Owner's direction. For example, some Account Assets have valuable rights that expire unless Owner directs some action to be taken. The Bank will not be responsible to determine the existence of any information relating to Account Assets that is published or otherwise made available prior to the Bank's assuming investment responsibility for such Account Assets.

### D. Stripped Coupons

The Bank will not accept custodial responsibility for bond coupons which are detached from the underlying certificate. The Bank will only assume custodial responsibility for a receipt issued by another depository or custodian which has physical possession of such coupons.

### E. Variable Rate Securities

With respect to amounts received on account of any debt securities which are acquired at Owner's direction and which provide a variable or floating interest rate, the Bank will be responsible for the timely and accurate allocation and credit thereof only if the documentation which accompanies the receipt indicates the applicable interest rate or Owner provides timely information regarding the rates.

### F. Securities Subject to Options

If the Owner has selected an Investment Advisory Account or a Custodial Account, with respect to any securities which are subject to either or both a put or call option, it shall be Owner's responsibility to know the rights, obligations, basis, value, and other terms of options purchased or held at Owner's direction. For example, some Account Assets have valuable rights that expire unless Owner directs some action to be taken. The Bank shall have no responsibility or liability for failure to take action in the absence of Owner's directions.

21

### G. Payment of Taxes; Tax Reporting;

#### Tax Withholding

The Bank is not responsible for paying any taxes
which may be owed with regard to the Account Assets
or their income, or for preparing or filing any tax
returns, except for withholding for taxes to the extent
required by statute or treaty. The Bank will undertake
to reclaim foreign taxes paid on income derived from
foreign securities in the Account only to the extent it
deems reasonably practicable. Owner agrees to pro-
vide the Bank with all information it may need to per-
form such withholding or tax reporting. The Bank
shall provide Owner with an annual statement for tax
reporting purposes, including a Tax Information
Letter which summarizes account income, expenses
and realized gains and losses. The Bank will charge
for the Tax Information Letter according to its pub-
lished Tax Services Schedule of Fees. The Bank shall
be entitled to rely on tax basis information provided
by Owner.

#### H. Suspension of Action

If the Bank believes there is a dispute over the control
or ownership of the Account Assets or the Account,
the Bank may without liability suspend or terminate
any actions under this Agreement until such disputes
are resolved to the Bank's satisfaction. The Bank may
petition any court for instructions or other relief at the
expense of the Account and the Owner, including the
Bank's attorney's fees and expenses.

## VII. Limited Responsibilities and Indemnification

This Article survives the termination of this Agreement
and binds Owner and Owner's successors, assigns, heirs
and personal representatives, and any entity on whose
behalf this Agreement was entered into.

#### A. Limited Responsibilities and Liability

The Bank is responsible for the performance of only
such duties as are specifically set forth in this
Agreement with no implied duties or responsibilities.
Bank may delay enforcing its rights under this
Agreement without waiving them. If Bank waives a

22

provision of this Agreement, the waiver applies only
in the specific instance in which the Bank decides to
waive the provision and not to future situations or
other provisions. The Bank is not liable for actions
taken or omitted pursuant to this Agreement or
Owner's instructions or for the good faith exercise of
investment judgment. The Bank will perform such
duties with the ordinary skill and care of an agent and
shall not be bound by laws, rules or regulations apply-
ing specifically to trusts or broker-dealers, including
the rules and regulations of the NASD or the NYSE.
The Bank's acts and omissions are solely on Owner's
behalf and at Owner's risk, and no person not a party
to this Agreement shall have any rights hereunder
except as expressly set forth in this Agreement. The
Bank is only liable for any loss, reduction in value or
income directly caused by its gross negligence or
willful misconduct. Except as limited by applicable
law, under no circumstances shall the Bank be liable
for any incidental, consequential, special, exemplary
or punitive damages.

## B. Bank's Performance and Recommendations; Bank Followed Securities

Neither Bank nor any of its Bank Affiliates, officers,
directors or employees make any representations or
warranties, express or implied, that any level or
performance or investment results will be achieved by
the Account or that the Account will perform compa-
rably with any standard or index, including other
clients of Bank, whether public or private. Owner
agrees that the Bank does not guarantee the results of
its recommendations or investment decisions and the
Bank will not be liable to Owner or anyone else for
any loss sustained either by reason of Owner's acting
or failing to act upon the Bank's recommendations to
Owner.

Owner acknowledges that it may take time, perhaps a
significant amount of time, for Account Assets to be
fully invested in accordance with Owner's Investment
Objectives. Examples, without limitation, include
where the Account is new, where assets are not deliv-
ered to the Bank on a timely basis, where the Owner
has changed Owner's Investment Objectives, or where
Account Assets have been added or sold. Market and

23

tax considerations, among other things, may affect such timing. The Bank will not be liable for its good faith decision to delay fully investing or reinvesting Account Assets.

In order to provide investment services the Bank researches and follows a specific group of companies and securities. The Bank has no responsibility for monitoring any security it does not follow or for informing Owner of any changes relating to securities of an issuing company the Bank does not customarily follow. The Bank has no duty to disclose to Owner the groups of securities it researches or follows, or any changes thereto, or the results of any research, or any recommendations it makes to any other Client regarding any investment.

## C. Equity Aggregation Disclosure

The overall investment activities of the Bank and Bank Affiliates may limit the investment opportunities for accounts under their management in certain markets in which limitations are imposed by regulators upon the amount of investment by affiliated investors, in the aggregate or in individual issuers. From time to time, accounts' activities also may be restricted because of regulatory restrictions applicable to the Bank and Bank Affiliates, and/or their internal policies.

## D. Indemnification

Owner (or Owners jointly and severally) releases, indemnifies, defends and holds harmless the Bank, its parent, their subsidiaries, affiliates, and successors, and each of the respective officers, directors, affiliates, employees, nominees, and agents thereof (collectively "Indemnified Parties") from and against any claim, liability, loss, damage or expense (including legal fees and expenses of the Indemnified Parties and/or any third party claimant) of any nature, directly or indirectly arising out of or relating to any act or omission pursuant to this Agreement or at Owner's direction, except for any claim, liability, loss, damage or expense arising out of an Indemnified Party's gross negligence or willful misconduct. Except as limited by applicable law, in no event will an Indemnified Party be liable for incidental, consequential, special, exemplary or punitive damages.

24

## VIII. Recording of Client Calls

To ensure accurate service, Owner agrees that Owner's calls and calls made on Owner's behalf with the Bank may be recorded.

## IX. Amendment; Revocation

### A. Amendment

The Bank may amend this Agreement in whole or in part by an instrument delivered to Owner thirty (30) days prior to the effective date of such amendment and Owner's continued use of the Bank's services under this Agreement shall constitute Owner's acceptance of the terms of the Bank's amendment. Owner may amend this Agreement in whole or in part by an instrument signed by all Owners and the Bank.

### B. Revocation

Owners, acting together, or the Bank shall have the power and right to revoke this Agreement by an instrument signed and delivered to the other party thirty (30) days prior to the effective date of such revocation. Notwithstanding the foregoing, the Bank may revoke this Agreement at any time, with or without notice, if (a) the Bank believes that Owner is bankrupt or otherwise insolvent, (b) there is a dispute or claim with respect to the Account, (c) any proceedings are commenced regarding the Account, or (d) the Bank deems itself or any Bank Affiliate to be at material risk if this Agreement is not revoked in fewer than 30 days.

Upon revocation the Bank will deliver the Account Assets to Owner or in accordance with Owner's written instructions, as soon as practicable. If this Agreement is revoked while more than one Owner is living, the Bank shall deliver the Account Assets jointly to all the surviving Owners, or in accordance with their joint written instructions, as soon as practicable. The Bank shall be required to make delivery of Account Assets only when all sums due the Bank from Owner are paid and the Bank is indemnified in a manner and amount satisfactory to the Bank against liabilities incurred in the performance of the Bank's duties under this Agreement. Upon making the delivery of Account Assets as provided in this paragraph, the Bank shall have no further responsibility under this Agreement.

During the period between the effective date of revocation and the date when the Account Assets are fully distributed, the Bank will continue to charge its standard fee under this Agreement, and will cease providing investment management and investment advisory services. If Account Assets are not fully distributed within 30 days after the effective date of revocation through no fault of the Bank, the Bank may charge and collect its fee then in effect for custody services.

## X. Pledge of Assets and Waiver of Conflicts

Owners, acting together, retain the right to pledge some or all of the Account Assets as collateral for loans to Owner or other parties. The lender may be the Bank or a Bank Affiliate and Owner waives all conflicts of interest that may arise from such loans. In such case, Owner agrees that nothing in this Agreement in any way (a) amends, modifies or otherwise affects the terms and conditions of any loan, credit or other document ("loan document") between Owner and the Bank or any Bank Affiliate, or (b) imposes a fiduciary duty of any sort on the Bank or the Bank Affiliate with respect to any such loan document. Owner further agrees that to the extent of any inconsistency between this Agreement and the terms of any loan document with the Bank or any Bank Affiliate, the terms of the loan document shall control. Thus, and without limitation, nothing in this Agreement affects the right of the Bank or any Bank Affiliate to exercise its remedies regarding the Account (such as foreclosing on the Account) as provided in such loan document.

In the event that Owner has pledged the Account Assets to any lender (whether or not such lender is the Bank or a Bank Affiliate), Owner hereby directs the Bank to follow any order of the lender directing sale or transfer of the Assets, and remitting the proceeds to the lender, without further consent from or notice to Owner. Owner agrees to hold the Bank harmless against any and all claims, liabilities and expenses incurred by reason of compliance with such orders from the lender. Owner understands that if the lender is the Bank or a Bank Affiliate, the Bank may take action to protect its interests as lender which could be contrary to Owner's interests and investment objectives.

26

## XI. Governing Law

This Agreement will be governed by the applicable laws of the state where the Account is principally administered, as designated by the Bank, except to the extent an applicable law of the state where the Account is principally administered is preempted by federal law, in which case federal law shall govern the provisions of this Agreement rather than the preempted state law. Any action regarding this Account must be brought in the state whose law governs or controls this Account and Owner submits to the personal jurisdiction of that state, unless a Claim (as defined in this Agreement) is submitted to arbitration and that location is not reasonably convenient for the Owner, in which case the parties will attempt to agree on a location, and if unable to do so the determination shall be made by the Administrator or arbitrator.

## XII. Attorneys' Fees

In the event a legal action is commenced in connection with this Agreement, each side will bear its own costs and attorneys' fees, regardless of the outcome.

## XIII. Dispute Resolution Provision: All States, except California

### A. General Provisions

1. READ THIS DISPUTE RESOLUTION PROVISION CAREFULLY. Owner understands that the waivers described below constitute a material inducement for the Bank to enter into this Agreement.

2. JURY TRIAL WAIVER: THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY AS PERMITTED BY LAW WITH RESPECT TO THE CLAIM. THIS WAIVER OF JURY TRIAL SHALL REMAIN IN EFFECT EVEN IF THE CLASS ACTION WAIVER IS LIMITED, VOIDED OR FOUND UNENFORCEABLE. THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO A TRIAL BY JURY TO THE FULLEST EXTENT PERMITTED BY LAW.

3. CLASS ACTION WAIVER: THE PARTIES AGREE AND ACKNOWLEDGE THAT THIS

27

SECTION PRECLUDES THE PARTIES FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION AGAINST EACH OTHER WITH RESPECT TO A CLAIM.

4. "Claim" means any claim, dispute or controversy between Owner and Bank that in any way arises from or relates to this Agreement (including any renewals, extensions or modifications). For purposes of this Dispute Resolution Provision, the terms "Bank" and "parties" shall include the Bank and its parent companies, wholly or majority-owned subsidiaries, affiliates, successors and assigns and any of their past or present employees, officers and directors.

### B. Rules of Interpretation

If any portion of this Dispute Resolution Provision is determined to be invalid or unenforceable, it shall not invalidate the remaining portions of this Dispute Resolution Provision. In the event of a conflict or inconsistency between this Dispute Resolution Provision and other terms of the Agreement , this Dispute Resolution Provision shall govern.

## XIV. Dispute Resolution Provision: California

### A. General Provisions

1. READ THIS DISPUTE RESOLUTION PROVISION CAREFULLY.

2. All Claims shall be resolved in court by a judge without a jury; except those brought in California state court, in which case such Claims shall be determined by general reference to a referee under California Code of Civil Procedure (C.C.P.) Section 638. The judicial reference or trial by a judge will take place on an individual basis without resort to any form of class or representative action.

3. JURY TRIAL WAIVER: WHETHER THE AGREEMENT IS SUBMITTED TO JUDICIAL REFERENCE OR TRIAL BEFORE A JUDGE WITHOUT A JURY, THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY AS PERMITTED BY LAW WITH RESPECT TO THE CLAIM. THIS WAIVER OF JURY TRIAL

28

SHALL REMAIN IN EFFECT EVEN IF THE CLASS ACTION WAIVER IS LIMITED, VOIDED OR FOUND UNENFORCEABLE. WHETHER THE CLAIM IS DECIDED BY JUDICIAL REFERENCE OR TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO A TRIAL BY JURY TO THE FULLEST EXTENT PERMITTED BY LAW.

4. CLASS ACTION WAIVER: WHETHER THE CLAIM IS DECIDED BY JUDICIAL REFER-ENCE OR TRIAL BEFORE A JUDGE WITHOUT A JURY, THE PARTIES AGREE AND ACKNOWLEDGE THAT THIS SECTION PRE-CLUDES THE PARTIES FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION AGAINST EACH OTHER.

5. "Claim" means any claim, dispute or controversy between Owner and Bank that in any way arises from or relates to this Agreement (including any renewals, extensions or modifications). For purposes of this Dispute Resolution Provision, the terms "Bank" and "parties" shall include the Bank and its parent compa-nies, wholly or majority-owned subsidiaries, affiliates, successors and assigns and any of their past or present employees, officers and directors.

B. Judicial Reference Provision

1. Selection of Judicial Referee: The judicial referee shall be an active or retired judge, justice or attor-ney with more than 10 years of experience, chosen by mutual agreement of the parties. If the parties are unable to agree on a referee within 10 days of a written request to do so by either party, either party may thereafter seek to have the referee appointed by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure Section 640.

2. Governing Law: C.C.P. Section 638 and the following related sections shall govern Judicial Reference. The referee, sitting alone without a jury, will decide all questions of law and fact in accordance with existing California case law, statutory laws and rules of evidence. Subject to Articles VII.A and VII.C of this Agreement and applicable law, the referee shall

be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in civil litigation , including without limitation motions for summary judgment or summary adjudication. The referee's decision shall be governed by the requirements of C.C.P. Sections 644(a) and 645. The parties reserve the right to seek appellate review of any judgment or order, to the same extent permitted in a court of law.

## C. Rules of Interpretation

If any portion of this Dispute Resolution Provision is determined to be invalid or unenforceable, it shall not invalidate the remaining portions of this Dispute Resolution Provision. In the event of a conflict or inconsistency between this Dispute Resolution Provision and other terms of the Agreement, this Dispute Resolution Provision shall govern. Subject to the provisions of Article X, if there is any conflict between this Dispute Resolution Provision and any other dispute provision (whether it concerns arbitration, reference or any other form of dispute resolution), this Dispute Resolution Section shall prevail for Claims arising out of this Agreement or the transaction(s) contemplated by this Agreement.

## XV. Binding on Successors

This Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties, and as appropriate, beneficiaries, officers, partners, and directors, and any entity on whose behalf this Agreement was entered into, except that Owner may not assign Owner's rights or responsibilities under this Agreement to any party without the Bank's written consent.

## XVI. Construction

This Agreement contains the entire agreement between the parties hereto. The unenforceability or invalidity of any provision of the Agreement shall not affect the enforceability or validity of any other provision of this Agreement. The article and paragraph headings used in this Agreement are for convenience of reference only, and not for interpretation of this Agreement. The masculine, feminine, or neuter gender, and the singular or plural number, will be deemed to include the others, as the context requires.

30

## XVII. Character of Property; Form of Account Ownership

### A. Character of Property and Form of Account Ownership May Have Significant Tax and Property Implications

The Bank does not give legal or tax advice. Owners are advised to consult with their legal advisor prior to declaring the character of property contributed to the Account and selecting the form of Account owner-ship, because it may have significant tax and property implications. The Bank is not responsible for the tax consequences of any of its actions or omissions regarding the Account.

### B. Joint Management Community Property or Separate Property

If Owners have contributed Texas community proper-ty to the Account, the Bank is directed by Owners to consider the entire Account Assets as Owners' joint management community property. Owners' property transferred to this Account and its proceeds will retain its character as joint management community proper-ty during Owners' joint lifetimes. If Owner has con-tributed separate property to the Account, the Bank shall have the right to rely upon Owner's representa-tion that the Assets are, and shall retain their character as Owner's separate property.

### C. Joint Tenants with Right of Survivorship

If Owner has identified the Form of Account Ownership as "Joint Tenants with Right of Survivorship", the Bank is directed by Owners to consider the entire Account Assets as Owners' joint property with right of survivorship. Owners' property transferred to this Account and the proceeds thereof shall retain its character as joint property with right of survivorship during Owners' joint lifetimes.

31

*Notes*

# EXHIBIT B

# LAW OFFICE OF JASON CICHOWICZ

## 110 S. Taylor Street
## South Bend, IN 46601
### Telephone: (574) 289-7112
### Facsimile: (574) 234-3363

**To:**      Ms. Jennifer Martay

**Fax:**     (312) 923-1696

**From:**    Jason Cichowicz

**Date:**    June 23, 2016

**Re:**      Amended 1993-2 Trust
             Russell Cartwright

**Pgs:**     7 (including cover)

## MESSAGE:

Jennifer, should you need anything further, please call me on my cell at ██████
██. Thank you.

CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information belonging to
the sender which is legally privileged. The information is only for the use of the individual(s) or the entity
named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying,
distribution or the taking of any action in reliance on the contents of this telecopied information is strictly
prohibited. If you have received this telecopy in error, please notify us by telephone at the number above
to arrange for return of the original documents to us. Thank you.

# AMENDED AND RESTATED
# LEVERING RUSSELL CARTWRIGHT
# 1993-2 TRUST

## THIS AMENDED AND RESTATED LEVERING RUSSELL CARTWRIGHT 1993-2

**TRUST** made and entered into by and between Levering Russell Cartwright, of South Bend, Indiana

(hereinafter referred to as "Settlor"), and Levering Russell Cartwright, of South Bend, Indiana

(hereinafter referred to as "Trustee").

### WITNESSETH:

**WHEREAS**, Levering Russell Cartwright, Settlor of the Levering Russell Cartwright 1993-2

Trust, dated the 21st day of May, 1993, hereby restates and amends said declaration of Trust as

follows:

### ARTICLE ONE

The Settlor has heretofore delivered to the Trustee the property described in Schedule

"A", the receipt of which was acknowledged by the Trustee. That sum and any property that may

be received by the Trustee from the Settlor as additions to this Trust shall be held and disposed of

by the Trustee on the terms stated in this Agreement. Property other than cash may be added to

the Trust and any property added to the Trust shall be re-titled in the name of the Trustee

designating that the Trustee is holding the asset in its capacity as Trustee.

ARTICLE TWO

The Settlor may, by signed instrument delivered to the Trustee during the Settlor's life, revoke this Agreement in whole or in part and amend it from time to time in any respect.

ARTICLE THREE

The Trustee shall invest and reinvest the Trust property. During the life of the Settlor, the Trustee shall pay all the net income of the Trust estate, and such portions of the principal as the Settlor may from time to time direct in writing, to the Settlor or otherwise as he may direct. However, during any period in the Settlor's life in which he is deemed mentally and/or physically incapacitated pursuant to a medical statement obtained from the Settlor's family physician, wherein said physician is of the medical opinion that Levering Russell Cartwright is unable to handle his financial affairs or make financial decisions, then the Successor Trustee shall proceed with the administration of this trust and shall, in his sole discretion, use so much of the net income and any portions or all of the principal for the support, maintenance, welfare, comfort, and medical expenses of the Settlor.

In the event Settlor's family physician is not available to issue said medical opinion, then the issue of incapacity shall be resolved by the written opinion of a duly licensed medical doctor actively engaged in medical practice in the State of Indiana or in the State where Settlor is a resident at the time. Nothing contained herein, shall prohibit Settlor and Successor Trustee from mutually agreeing to allow Successor Trustee to assume the duties of Trustee either on a temporary or permanent basis thereby eliminating the requirement of a medical opinion.

In the event Settlor subsequently recovers from his incapacity to the point that he has regained his mental and/or physical capacity to handle his financial affairs and make financial

Page 2 of 6

decisions, he shall resume his duties as Trustee by furnishing a medical statement obtained from his family physician to the Successor Trustee stating that in the opinion of said physician, he is once again able to handle his financial affairs and make financial decisions. Upon receipt of said documentation, Successor Trustees duties as Trustee shall abate until such time as Settlor shall once again be incapacitated or die. Settlor and Successor Trustee may mutually agree on Settlor's recovery, thereby eliminating the requirement of a medical statement.

Disbursement of such amounts may be made by the Successor Trustee for the benefit of the Settlor in any one or more of the following ways as the Successor Trustee shall deem most desirable:

A.     Directly to the Settlor;

B.     To the duly qualified legal representative of the Settlor, such as a Guardian or Conservator;

C.     To some relative or friend who has care or custody of the Settlor; or

D.     By the Trustee using such payment directly for the benefit of the Settlor.

The receipt of any such party shall release the Trustee from any liability for its expenditure.

## ARTICLE FOUR

After the death of the Settlor, the Successor Trustee shall continue to administer the Trust according to the provisions set out in this Trust Agreement.

The Successor Trustee shall continue to hold title to all assets in the trust until appropriate distribution can be lawfully made.

Page 3 of 6

A.    In the event that the Settlor's probate estate is insufficient to satisfy the deceased Settlor's legal debts and obligations, then the Trustee may collect the Settlor's bills, debts and expenses incurred as a part of the Settlor's last illness and may proceed to pay all legitimate debts of the deceased Settlor and shall process all medical claims prior to the distribution of the residuary trust estate as provided hereafter.

B.    The Trustee may prepare or supervise the preparation of all tax returns that are due as a result of the Settlor's death. These returns shall include the Federal Estate Tax Return (if applicable), the Settlor's personal income tax returns both Federal and State and any Fiduciary Income Tax Returns that are required as a result of this Trust. After the appropriate tax returns are filed and the taxes paid, then the Trustee shall proceed to distribute the residuary trust estate as outlined herein.

ARTICLE FIVE

Subject to the payment of the debts, expenses, and taxes as provided for above, upon the death of the Settlor, the Trust Property shall be distributed as follows:

The Trustee shall distribute Settlor's tangible personal property in compliance with any written, signed and dated memorandum left by Settlor directing the distribution of such property. All the rest, residue and remainder of the Trust assets of every kind and nature, and wheresoever located, and which Settlor may have the right to dispose of at the time of his death to Jason Cichowicz, free of Trust.

ARTICLE SIX

The Trustee shall have all powers conferred upon Trustee by law including the Trust

Page 4 of 6

Code of Indiana and any other power that may be granted by law, to be exercised without the necessity of Court approval, as the Trustee, in his sole discretion determines to be in the best interests of the beneficiaries. Said powers are to be construed in the broadest possible manner and shall include the following, but shall in no way be limited thereto.

1. To retain any property received from the Settlor without liability for loss due to lack of diversification or non-productivity.

2. To sell any Trust property, for cash or credit, at public or private sales; to exchange any Trust property, for other property, and to determine the prices and terms of sales and exchanges.

3. To collect, pay, contest, compromise or abandon demands of, or against the Trust estate and to execute contracts, notes, conveyance and other instruments, including instruments containing covenants and warranties binding upon and creating a charge against the Trust estate.

4. To invest and reinvest the Trust estate in real or personal property without regard to current income.

## ARTICLE SEVEN

Levering Russell Cartwright may resign as Trustee at any time by giving written notice, specifying the effective date of such resignation to the Settlor, or to Jason Cichowicz. In the event Levering Russell Cartwright resigns, is removed, or should be unwilling or unable to serve as Trustee, then Jason Cichowicz or his assign is hereby nominated and appointed as Successor Trustee. Such Successor Trustee shall have all the title, duties, powers, and discretion as Successor Trustee without the necessity of conveyance or transfer.

Page 5 of 6

## ARTICLE EIGHT

Settlor and Trustee hereby acknowledge and agree that this Amended and Restated Trust shall supercede all previous amendments, restatements and modifications of the Levering Russell Cartwright 1993-2 Trust dated the 21st day of May, 1992, heretofore executed by Settlor and Trustee. Any and all previous documents in conflict with the terms and conditions set forth herein are hereby revoked and annulled.

The Trustee named herein accepts his responsibility as created by this Agreement.

**IN WITNESS WHEREOF**, Levering Russell Cartwright has executed this Amended and Restated Declaration of Trust and has hereto affixed his signature as Settlor and Trustee at South Bend, Indiana this __12__ day of August, 2015.

_____          _____
Levering Russell Cartwright, *Settlor*          Levering Russell Cartwright, *Trustee*

STATE OF INDIANA      )
                      ) SS:
ST. JOSEPH COUNTY     )

Before me, a Notary Public, in and for the County and State aforesaid, personally appeared Levering Russell Cartwright personally known to me to be the Settlor and Trustee herein, and acknowledged the execution of the foregoing instrument, this __12__ day of August, 2015.

PHILIP C. POTTS
St. Joseph County
My Commission Expires
January 8, 2016

_____
Philip C. Potts, *Notary Public*
Resident of St. Joseph County, Indiana

This Document Prepared By:
Philip C. Potts (#5708-71)
108 N. Main Street, Suite 611
South Bend, Indiana 46601
(574) 234-2126

Page 6 of 6

# EXHIBIT C

# FOURTEENTH AMENDED AND RESTATED
# LEVERING RUSSELL CARTWRIGHT 1993-2 TRUST

THIS FOURTEENTH AMENDED AND RESTATED LEVERING RUSSELL CARTWRIGHT 1993-2 TRUST (the "Declaration of Trust") is made and entered into by and between Levering Russell Cartwright of South Bend, Indiana (hereinafter referred to as the "Settlor"), and Levering Russell Cartwright of South Bend, Indiana (hereinafter referred to as the Trustee") on the 5th day of June, 2018.

## WITNESSETH:

WHEREAS, the Settlor desires to establish a Trust for his benefit and to provide for the distribution of his property at his death;

WHEREAS, the Settlor has delivered to the Trustee the property set forth on Exhibit "A", which Exhibit is attached hereto and incorporated herein by reference, and which property is hereinafter referred to as the "Trust Property";

WHEREAS, the Trustee has accepted the Trust Property and has consented to hold and administer the Trust Property subject to the terms and conditions hereinafter set forth as is evidenced by the Trustee's Acceptance, which Acceptance is attached hereto, incorporated herein by reference, and marked Exhibit "B";

WHEREAS, as used in this Declaration of Trust, the following terms shall have the following meanings:

"The Settlor's Children" means Settlor's son, Charles Levering Cartwright, and Settlor's daughter, Anne Redhead. Settlor's children and their heirs are specifically disinherited and not provided for in this document, as this is Settlor's express wish and desire, and each family member is provided for in Settlor's deceased family members' Trusts; and

WHEREAS, Levering Russell Cartwright, Settlor of the Levering Russell Cartwright 1993-2 Trust, dated the 21st day of May, 1993, wishes to restate and amend the terms and provisions of his Trust, and has herein amended and restated the Trust terms and provisions in this Declaration of Trust;

NOW, THEREFORE, the Settlor hereby states and declares that the Trust Property, any accumulations thereof, any additions thereto, any property hereafter acquired by the Trustee as Trustee, and all proceeds and investments thereof, shall be held, managed, and distributed as follows:

1

## ARTICLE ONE
## TRUST PROPERTY

The Settlor has delivered to the Trustee the Trust Property described in Schedule "A", the receipt of which has been acknowledged by the Trustee. The Trust Property and any property that may be received by the Trustee from the Settlor as additions to this Trust, shall be held and disposed of by the Trustee on the terms stated in this Declaration of Trust.  Property may be added to the Trust, and any property added to the Trust shall become Trust Property, and shall be re-titled in the name of the Trustee, designating that the Trustee is holding the asset in his capacity as Trustee.

## ARTICLE TWO
## ADDITIONS TO TRUST PROPERTY

At any time, and from time to time, the Settlor or any other person, firm, or corporations, including fiduciaries, may increase or add to the principal of the Trust Property by gift, conveyance, transfer, assignment, or delivery of property, real or personal, tangible or intangible, by bequest or devise contained in a Last Will and Testament, or by designating the Trustee as beneficiary under an insurance policy.  Any such property received by the Trustee hereunder, as increased by all additions thereto and diminished by all withdrawals therefrom, shall be and become part of the Trust Property and shall be held and administered pursuant to the terms and conditions of this Declaration of Trust.

Notwithstanding the immediately preceding Paragraph, the Trustee may refuse to accept any property or assets as Trust Property if, in the sole discretion of the Trustee, to do so would create a burden upon or jeopardize the Trust.  More specifically, the Trustee must affirmatively accept all interests in real estate by the Trustee's endorsement upon the conveyance or transfer document before such interest in real estate shall be deemed to be Trust Property.

## ARTICLE THREE
## DISTRIBUTION OF INCOME AND PRINCIPAL DURING THE SETTLOR'S LIFE

During the lifetime of the Settlor, the Trustee shall receive, hold, and manage the Trust Property for the sole and exclusive benefit of the Settlor.

Subject to the limitations set forth in ARTICLES FOUR and FIVE, the Trustee shall invest and reinvest the Trust Property, collect the income therefrom, if any, and, after paying all expenses properly chargeable thereto, shall pay to or for the benefit of the

Settlor, in such installments as the Settlor and Trustee shall from time to time agree upon, all of the net income of the Trust Property together with such amount or amounts of principal of the Trust Property as the Settlor may from time to time request in writing. In the absence of a written direction to the contrary, the Trustee shall pay the net income of the Trust Property to the Settlor not less often than quarterly.

ARTICLE FOUR
MEDICAL DETERMINATION OF INCAPACITY

As stated above, the initial Trustee of the Trust Property is the Settlor. During any period in the Settlor's life in which he is deemed mentally and/or physically incapacitated pursuant to a medical statement obtained from the Settlor's family physician, and the medical statement indicates the physician is of the medical opinion that the Settlor, as initial Trustee, is unable to properly manage the principal or income of the Trust Property because of advanced age, impaired health, or mental or physical disability, then the Successor Trustee (named in ARTICLE ELEVEN) shall become responsible for the administration of this trust and shall use as much of the net income and any portions or all of the principal as is necessary for the care, support, maintenance, welfare, comfort, and medical expenses of the Settlor.

In the event Settlor's family physician is not available to issue a medical opinion, then the issue of incapacity shall be resolved by the written opinion of a duly licensed medical doctor actively engaged in medical practice in the State of Indiana. If the Settlor resides in another State, the medical statement can be issued by a duly licensed medical doctor in the State where Settlor resides.

Nothing contained herein, shall prohibit Settlor and Successor Trustee from mutually agreeing to allow Successor Trustee to assume the duties of Trustee either on a temporary or permanent basis thereby eliminating the requirement of a medical opinion.

If the physician determines in writing, as evidenced by a signed "Certificate of Incapacity", that the Settlor has become incapable of the care, custody and management of the principal or income of the Trust Property, or upon the judicial determination of the physical or mental incompetency of the Settlor, the Settlor shall become subject to the terms and conditions set forth in ARTICLES FIVE and SIX, and he shall be removed as initial Trustee.

In the event Settlor subsequently recovers from his incapacity to the point that he has regained his mental and/or physical capacity to handle his financial affairs and make financial decisions, he shall resume his duties as Trustee. The Settlor may furnish a medical statement obtained from his family or treating physician to the Successor Trustee

stating that in the opinion of said physician, he is once again able to handle his financial affairs and make financial decisions, or the "Certificate of Incapacity" may be revoked by such physician by a written certification that the Settlor is no longer incapacitated. Upon receipt of such documentation, the Successor Trustee's authority to serve as Trustee shall terminate until such time as Settlor shall once again become incapacitated or die. Upon such event, all rights and powers of the Settlor under this Declaration of Trust shall be operative again and shall revert back to the Settlor. The Settlor and Successor Trustee may mutually agree on Settlor's recovery, thereby eliminating the requirement of a medical statement.

ARTICLE FIVE
LIMITATION ON SETTLOR'S RIGHTS

During such period of time that the Successor Trustee is in possession of an apparently proper and effective Court order which states the Settlor is physically or mentally incompetent to act in Settlor's own behalf, or in possession of the "Certificate of Incapacity" as provided in ARTICLE FOUR, any attempt by the Settlor to exercise any reserved rights and powers to him as initial Trustee under this Declaration of Trust, including, but not by way of limitation, the right of revocation, amendment, modification, or withdrawal of principal, or receipt of, or direction of income, or the sale of principal of the Trust Property, or change of beneficiary of any insurance policy subject to this Declaration of Trust, shall be void, and during such period of time this Declaration of Trust shall be irrevocable and not subject to further amendment.

No Power of Attorney or Letters of Guardianship shall be sufficient authority to revoke, amend, or modify this Declaration of Trust unless such Power of Attorney expressly grants said authority and specifically refers to this Declaration of Trust or unless such Guardian has secured an Order from a Court of competent jurisdiction authorizing and directing the revocation, modification, or amendment of this Declaration of Trust.

ARTICLE SIX
DISTRIBUTIONS TO SETTLOR WHILE INCAPACITATED

In the event of the incapacity of the Settlor as provided in ARTICLE FOUR or FIVE, then, in addition to all other powers set forth in this Declaration of Trust, the Successor Trustee shall have the following powers:

A.     The Successor Trustee may distribute any income payment due to the Settlor by transmitting it directly to the Settlor; payment to the creditor for the Settlor's care, comfort, support, or maintenance; distributing the funds to a duly qualified legal

4

representative of the Settlor, such as a guardian or conservator; or by transfer to a relative, agent, or friend of the Settlor who has care or custody of him, to be applied to the expenses of the Settlor's care, comfort, support, or maintenance; and

B.      Should the Successor Trustee determine that the income available to the Settlor from all sources known to the Successor Trustee is insufficient for the reasonable care, comfort, support, or maintenance of the Settlor, then the Successor Trustee shall expend for the benefit of the Settlor so much of the Trust Property as the Successor Trustee, in his sole discretion, determines to be necessary or advisable.

The receipt of any such party shall release the Successor Trustee from any liability for its expenditure.

ARTICLE SEVEN
PAYMENT OF DEBTS, EXPENSES, AND TAXES AT THE DEATH OF THE
SETTLOR

Upon the death of the Settlor, the Successor Trustee shall administer the Trust according to the provisions set out in this Declaration of Trust.  The Successor Trustee shall hold title to all assets in the trust until appropriate distribution can be lawfully made.

After the death of the Settlor, in the event the assets of the Settlor's probate estate are insufficient, or should such assets be of a character that it would be impractical to sell the same for the payment of the Settlor's just debts, including the expenses of Settlor's last illness, funeral and burial expenses, the costs of the administration of the Settlor's estate, or other expenses that may be assessed or payable as a result of the Settlor's death, then, in either of those events, the Successor Trustee may expend from the Trust Property, either by payment to the Personal Representative of the Settlor's estate or directly to the creditors, a sum sufficient to pay or otherwise satisfy each of the above obligations which, in the judgment of the Successor Trustee, should be paid from the Trust Property.

This discretionary power to expend the Trust Property shall include, but not be limited to, the power of the Successor Trustee to pay any and/or all inheritance, transfer, succession, estate or similar taxes (including any interest or penalty thereon) assessed or payable by reason of the Settlor's death on any property, or interest in any property, which is included in the Settlor's estate for the purpose of computing such taxes.

The Successor Trustee may prepare or supervise the preparation of all tax returns that are due as a result of the Settlor's death. These returns shall include the Federal Estate Tax Return (if applicable), the Settlor's personal income tax returns both Federal and State and any Fiduciary Income Tax Returns that are required as a result of the

5

administration of the Trust. After the appropriate tax returns are filed and the taxes paid, the Successor Trustee shall proceed to distribute the residuary trust estate as outlined herein.

Payment of all amounts set forth in the immediately preceding paragraph shall be made from the residue of the Trust Property prior to any division thereof.  Thereafter, this Declaration of Trust shall be and become irrevocable and, subject only to the above, the Trust Property shall be distributed as set out in ARTICLE EIGHT.

ARTICLE EIGHT

DISTRIBUTION OF THE TRUST PROPERTY AT THE SETTLOR'S DEATH

Subject to the payment of the debts, expenses, and taxes as provided for in ARTICLE SEVEN and any expenses relating to the administration and distribution of the Trust and Trust Property, upon the death of the Settlor, the Trust Property shall be distributed as follows:

A.     The Successor Trustee shall distribute settlor's jewelry, clothing, household furniture, furnishings and fixtures, chinaware, silver, photographs, works of art, books, boats, automobiles, sporting goods, artifacts relating to Settlor's hobbies, and all other tangible articles of household or personal use in accordance with any written, signed, and dated memorandum left by Settlor directing the distribution of such property.  Should Settlor leave multiple written memoranda which conflict as to the disposition of any item of tangible personal property, that memorandum which is last dated shall control as to those items which are in conflict.

Any memoranda written, dated, and signed by Settlor disposing of Settlor's tangible personal property shall be incorporated by reference into this Declaration of Trust.

In the event that Settlor's state does not allow the use of the memorandum to distribute non-business tangible personal property, or, to the extent that Settlor's tangible personal property is not disposed of by memorandum for any reason, then the non-business tangible personal property shall be distributed to Jason Cichowicz.

In the event Jason Cichowicz predeceases Settlor, said tangible personal property shall be distributed to Jason Cichowicz's wife, Elizabeth Cichowicz.

B.     All of the remaining Trust Property held in the trust shall be distributed to Jason Cichowicz, free of trust.  In the event Jason Cichowicz predeceases the Settlor, all remaining Trust Property shall be distributed to Elizabeth Cichowicz, free of trust.

6

In the event both Jason Cichowicz and Elizabeth Cichowicz predecease the Settlor, all of the remaining Trust Property shall be distributed to Jason and Elizabeth's two children, Emma Cichowicz and Evan Cichowicz, in trust, pursuant to the terms and provisions of Children's Trust which follow hereafter.  If either Emma Cichowicz or Evan Cichowicz should predecease Settlor, the distribution of the remaining Trust Property shall be made to the survivor, in trust, pursuant to the terms and provisions of the Children's Trust which follows hereafter.  In the event all of the above listed individuals predecease the Settlor, then the Trust Property shall be distributed in its entirety to my former attorney, David Newman.

<u>CHILDREN'S TRUST PROVISIONS</u>

In the event Jason Cichowicz and Elizabeth Cichowicz predecease the Settlor, and either or both of their children are alive at the time of Settlor's death, all remaining Trust Property shall be transferred into a Trust (the "Children's Trust"), to be held for their benefit.  The parents of Jason Cichowicz, or either of them, shall serve as Trustee of the Children's Trust created for the benefit of Emma Cichowicz and Evan Cichowicz.

The Trustee shall administer the Children's Trust according to the provisions set out in this Declaration of Trust.  The Trustee shall hold title to all remaining Trust Property in the Children's Trust until appropriate distribution can be lawfully made.  The Trustee shall collect income from the Trust Property and shall accumulate the income as designated below.

The Trustee shall divide the Trust Property into two (2) equivalent amounts, and shall administer the Trust independently for each child.  The Trustee shall have the discretion to expend funds for one child at a different rate than the expenditure of funds for the other child, depending upon each child's needs and circumstances.

If at the time this trust is established and the funds divided into two equivalent amounts, either of the children are under thirty-five (35) years of age, the Trustee may transfer to said child or children, or to his or her guardian, on his or her behalf, sufficient funds, in the Trustee's sole discretion, to pay for such child's cost of living, including payment for educational, medical, and living expenses, The Trustee shall also have the discretion to transfer an amount deemed sufficient to cover the cost of either of both children's living expenses through the transfer of a monthly or quarterly amount, to be determined by the Trustee.  The Trustee may contribute as much of the net income derived from each beneficiary's trust fund and so much of the corpus of that child's Trust Property as the Trustee may deem advisable to provide properly for each beneficiary's support, maintenance, health, and education.

7

The Trustee shall act prudently in this regard. Any income not so disbursed shall be added to the principal of each child's trust fund, until said beneficiary reaches thirty-five (35) years of age. The distribution ages outlined below are subject to discretion on the part of the Trustee. In the event the Trustee believes a child has misspent the funds received from any distribution, or has acted in a financially irresponsible manner, the Trustee shall have the authority to delay or diminish the amount paid to the child on the next distribution date. A reasonableness standard shall be employed by the Trustee to determine whether the child has expended funds in a frivolous or foolish manner.

Subject to the exception outlined in the previous paragraph, the Trustee shall make distributions from each child's separate Trust Property when such child reaches the age of twenty-five (25), thirty (30) and thirty-five (35). When a child has attained twenty-five (25) years of age, the Trustee shall transfer one-third (33%) of that child's Trust Property to the child, free of trust. When a child has attained the age of thirty (30) years, the Trustee shall transfer one-half (50%) of the Trust Property then contained in trust to the child, free of trust. When a child has attained the age of thirty-five (35) years, the Trustee shall transfer to the child the balance of that child's then remaining Trust Property, free of trust and the trust shall terminate.

In the event either child has attained the age of thirty-five (35) years at Settlor's death, the distribution of that child's share of Trust Property shall be paid to the child, free of trust, as soon after Settlor's death as is prudent.

In the event either of the above-named children should survive the date of Settlor's death, but die before that child's share of the Trust Property set forth above is paid to him or her, then any of that child's remaining Trust Property shall be transferred, in trust, to that child's surviving issue, per stirpes, pursuant to the terms and provisions of the Children's Trust set forth above. If either child dies without surviving issue, the deceased child's remaining Trust Property shall be distributed to that child's sibling, pursuant to the terms of the Children's Trust set forth above.

## ARTICLE NINE
## TRUSTEE'S POWERS

In addition to, and not in limitation of, all other powers conferred by law or by the terms and provisions of this Declaration of Trust, the Trustee shall have the following powers in the administration of the Trust and the Trust Property, and such powers may be exercised as the Trustee shall determine, in the Trustee's discretion, to be in the best interest of the Trust and its beneficiaries:

A.    To make any and/or all tax elections which in any way may benefit this Declaration of Trust or any of its beneficiaries: by this direction the Settlor means, by way of example and not by way of limitation, that the Trustee may, in the Trustee's sole discretion:

      1.    Elect to have a specified portion or all of the assets of any Trust(s) created pursuant to Declaration of Trust be qualified as terminable interest property as that term is used in the Federal Estate Tax Law in effect at the time of the execution of this Declaration of Trust; or

      2.    Exercise the power to allocate any exemption from Federal Tax on Generation-Skipping Transfers provided by IRC §2631 et. Seq. In effect at the appropriate time to any property with respect to which the Settlor is treated as the transferor, without regard to whether such property is part of the Settlor's probate estate or this Declaration of Trust, and to exclude any such property from such allocation; and/or

      3.    Divide any Trust created pursuant to this Declaration of Trust into separate Trusts in order that the inclusion ratio for Federal Generation-Skipping Tax purposes for each such separate Trust shall be zero (0) or one (1);

B.    If any Trust subject to this Declaration of Trust contains shares of stock in a corporation treated (or intended to be treated) as an S Corporation pursuant to the Internal Revenue Code of 1986 as amended (hereinafter referred to as the IRC) and if the then current laws require single beneficiaries for such Corporation to maintain such tax status, then such stock shall be segregated and held for each beneficiary in a separate Qualified Subchapter S Trust (hereinafter referred to as an S Trust) and the Trustee shall make the elections and distributions necessary to qualify as an S Trust as defined in IRC §1361:

      1.    The Trustee may enter into agreements with shareholders for dividends and the frequency of income allocation which, however, shall not be less frequently than annually;

      2.    The income interest of each beneficiary in and to such beneficiary's S Trust shall terminate on the earlier of such beneficiary's death or the termination of such beneficiary's S Trust;

      3.    If the S Trust is terminated during a beneficiary's lifetime, all remaining principal and undistributed income must be distributed at the time of termination; and

4.    If it is determined that principal is to be distributed to a beneficiary, the principal component of the S Trust may only be distributed to the individual beneficiary of such Trust.

C.    If any of the Trust Property subject to this Declaration of Trust constitutes benefits payable under a qualified pension or profit sharing plan described in IRC §401(a), Keogh plans described in IRC §401(d), and/or Individual Retirement Accounts (IRA's) described in IRC §408, all of the above being hereinafter collectively referred to as "Plan Assets", then, in addition to all other authority conferred upon the Trustee by this Declaration of Trust or otherwise, the Trustee shall have the authority:

1.    To elect any manner of payment of the Plan Assets;

2.    To extend the pay-out period of the Plan Assets for as long as possible,

3.    To withdraw any and/or all Plan Assets, or the earnings on or of Plan Assets, at any time and from time to time; and

4.    To distribute all or any portion of such Plan Assets, or the earning on or of Plan Assets, distributed or distributable to this Declaration of Trust to any Trust(s) created pursuant to this Declaration of Trust, to any beneficiary of any such Trust(s), or to accumulate such Plan Assets in any such Trust(s);

5.    Except, however, that the Trustee shall not pay any of the Settlor's debts, claims allowed during the administration of the Settlor's estate or this Declaration of Trust, the administration expenses of the Settlor's estate or this Declaration of Trust, or any taxes due and payable as a result of the Settlor's death on any property or interest in property includible in the Settlor's Estate for the purpose of computing such taxes from Plan Assets to the extent that the other assets are readily available to discharge such obligations;

D.    To retain any Trust Property, including residential real estate, or an undivided interest in Trust Property, received from any source whether or not such Trust Property be of a character permissible for investment by fiduciaries under applicable law, and regardless of any lack of diversification, risk or non-productivity;

E.    To invest and reinvest Trust Property in bonds, notes, stocks of corporations, regardless of class, real estate or any interest in real estate, common trust funds, or in any other property, wherever located, without being limited by any statute or rule of law concerning investments by fiduciaries;

10

F.      To sell, transfer, exchange, acquire, lease, rent, mortgage, pledge, give options upon, or otherwise dispose of any Trust Property at private or public sale, for cash or on credit, and upon whatever terms the Trustee deems advisable, without notice or order of Court;

G.      To operate, maintain, repair, rehabilitate, alter, improve or remove any improvements on real estate, to make leases and subleases for such periods as the Trustee deems advisable, even though the terms may extend beyond the termination of this Declaration of Trust; to partition or subdivide real estate, to grant easements, give consents and make contracts relating to real estate, or to its use, and to release or dedicate any interest in real estate;

H.      To engage in any actions or to exercise any powers necessary for the effective administration of corporate securities and other Trust Property including, without limiting the generality of this power;

       1.      Power to vote in person or by proxy upon all securities held by the Trustee;

       2.      Power to engage in a voting trust or voting agreement with respect to securities;

       3.      Power to consent to mergers, consolidations, foreclosures, reorganizations, Receiverships, bankruptcies, sales of assets, liquidations, acquisitions, redemptions or other alterations of corporate structure, whether or not these adjustments involve payments by or to the Trustee; and

       4.      Power to hold securities or other property registered in the name of the Trustee with or without disclosure of the fiduciary relationship, or in the name of a nominee; the Trustee may also hold securities or other property unregistered in such condition that ownership will pass by delivery;

I.      To collect, pay, contest, compromise, submit to arbitration, adjust, settle, compound, renew, or abandon any claims of or against the Trust Property without prior Court approval, and to make, execute and deliver any instrument and to enter into covenants or agreements binding on this Declaration of Trust or the Trustee;

J.      To borrow money in the name of any Trust created pursuant to this Declaration of Trust from the commercial department of any Corporate Trustee, or from any other source, for the purpose of preserving, protecting, and improving Trust Property, or for any other purpose which will facilitate the administration of this Declaration of Trust, and to mortgage or pledge any Trust Property in order to secure the money so

borrowed;

K.     To maintain non-interest bearing accounts (i.e., checking accounts) with the commercial department of any Corporate Trustee, or with any other bank or institution, for any proper purpose;

L.     To determine the manner of ascertainment of income and principal and the allocation and appointment of receipts and disbursements between income and principal;

M.     To make any distribution or division of Trust Property in cash or in kind, or both, notwithstanding the fact that interests in property so distributed or divided may, as a result, be composed differently;

N.     To allocate the different kinds of disproportionate shares of property among the beneficiaries of this Declaration of Trust and to determine the value of such property;

O.     To receive additional property from any source and add it to the property held in a fiduciary capacity;

P.     To establish out of the income and to credit to principal reasonable reserves for the depreciation of tangible property;

Q.     To employ attorneys, accountants, investments advisors, or other professional advisors, depositories, proxies agents and appraisers with or without discretionary power(s);

R.     To rely on and act upon all notices, affidavits, letters, certificates, and other information which the Trustee, in good faith deems reliable;

S.     No person paying money or delivering and property to the Trustee need see to its proper application;

T.     The Trustee shall be entitled to reasonable compensation for services rendered pursuant to this Declaration of Trust and to reimbursement for expenses; and

U.     The Trustee shall have the right, but not the duty, to docket this Declaration of Trust in any Court having jurisdiction and thereafter to administer such Declaration of Trust under the Order of such Court.

The Trustee may seek the instruction or approval of any Court having jurisdiction in regard to the performance of any act performed, or proposed to be performed, by the Trustee, or in regard to any other problem or question affecting this Declaration of Trust,

12

without irrevocably subjecting the entire administration of this Declaration of Trust to the control of such Court; having once sought such judicial determination, the Trustee may thereafter withdraw this Declaration of Trust from all further supervision or control of such Court, and the Trustee shall not thereafter be required or committed to seek judicial instruction or approval respecting any subsequent matter affecting this Declaration of Trust.

ARTICLE TEN
GENERAL PROVISIONS

The Trustee shall maintain the records for the Trust on a calendar year basis.

So long as the Settlor is living, the Trustee shall, not less often than annually, or as soon thereafter as is reasonable, render an accounting of the Trustee's receipts and disbursements to the Settlor, Settlor's agent, Guardian, or assigns; after the death of the Settlor, said accounting shall be rendered to the residuary beneficiaries. The written approval of the person to whom said accounting is directed shall, as to all matters and transactions stated therein or shown thereby, be final and binding upon all persons who are then, or may thereafter become, interested in or entitled to share in the income or principal of the Trust.

This Trust is an Indiana Trust, made in that State to be governed, construed, and administered according to its laws and shall continue to be so governed and construed though administered elsewhere. Notwithstanding the foregoing sentence, should a conflict arise between the laws of the State of Indiana and the Internal Revenue Code concerning the governance, construction, or administration of this Trust, then, in that event, this Trust shall be administered so as to comply with the applicable provisions of the Internal Revenue Code.

No interest in income or principal shall be alienated, encumbered, assigned, or pledged by any income or remainder beneficiary or subject to attachment or any claims of creditors of any beneficiary while in the possession or control of the Trustee.

If any beneficiary should attempt to alienate, encumber, or dispose of all of the income or grants of principal before the income or grants have been delivered by the Trustee, or if by reason of bankruptcy or insolvency, or any attempted execution, levy, attachment, or seizure of any assets remaining in the hands of the Trustee, under the claims of creditors or otherwise, such that all or any part of the income or principal might fail to be enjoyed personally by any beneficiary or might vest in or be enjoyed by some other person, then that interest shall terminate. Thereafter, the Trustee may pay to or for the benefit of such beneficiary or such beneficiary's descendants, such income or principal comprising the interest as the Trustee, in the Trustee's discretion, shall deem proper, until

13

the beneficiary dies.  At that time, the Trust estate or part affected shall be distributed to said beneficiary's issue, per stirpes, in trust, pursuant to the terms and provisions of the Children's Trust which is set forth above.  If no such issue survive, then said distribution shall be made equally to said beneficiary's siblings, or if any sibling is deceased with issue, to said, to said issue, per stirpes, in trust, pursuant to the terms and provisions of the Children's Trust set forth above.

If any Trust subject to this Declaration of Trust contains shares of stock in a corporation treated as an S Corporation or intended to be so treated pursuant to the Internal Revenue Code of 1986 as amended (hereinafter referred to as the IRC) and if the then current laws requires single beneficiaries for such corporation to maintain such tax status, then such stock shall be segregated and held for each beneficiary in a separate Qualified Subchapter S Trust (hereinafter referred to as an S Trust) and the Trustee shall make the elections and distributions necessary to qualify as an S Trust as defined in IRC §1361.

The Trustee may enter into agreements with shareholders for dividends and the frequency of income allocation which, however, shall not be less frequently than annually. The income interest of each beneficiary in and to such beneficiary's S Trust shall terminate on the earlier of such beneficiary's death or the termination of such beneficiary's S Trust. If the S Trust is terminated during a beneficiary's lifetime, all remaining principal and undistributed income must be distributed at the time of termination.  If it is determined that principal is to be distributed to a beneficiary, the principal component of the S Trust may only be distributed to the individual beneficiary of such Trust.

ARTICLE ELEVEN
RESIGNATION, REMOVAL AND SUCCESSOR TRUSTEE

Levering Russell Cartwright may resign as Trustee at any time by giving written notice, specifying the effective date of such resignation, to the Settlor or to the beneficiary(s) then entitled to the income of the Trust Property.

In the event that Levering Russell Cartwright resigns, is removed, or is unwilling or unable to serve as Trustee, then Jason Cichowicz is hereby nominated and appointed as Successor Trustee.  In the event that Jason Cichowicz resigns, is removed, or is unwilling or unable to serve as Successor Trustee, then U.S. Trust is hereby nominated and appointed as Successor Trustee.

Such Successor Trustee(s) shall not be liable for the acts, defaults, or omissions of any prior Trustee.  Such Successor Trustee(s) may accept as correct without examination the accounts rendered by the prior Trustee and properly delivered by the prior Trustee without incurring any liability.

14

Such Successor Trustee(s) shall have all of the title, duties, powers, and discretion as the Trustee succeeded without the necessity of conveyance or transfer.

## ARTICLE TWELVE
## REVOCATION AND AMENDMENT

Settlor and Trustee hereby acknowledge and agree that this Fourteenth Amended and Restated Declaration of Trust shall supercede all previous amendments, restatements and modifications of the Levering Russell Cartwright 1993-2 Trust dated the 21st day of May, 1992, heretofore executed by Settlor and Trustee.  Any and all previous documents in conflict with the terms and conditions set forth herein are hereby revoked and annulled.

The Settlor may, by signed instrument delivered to the Trustee during the Settlor's life, revoke this Declaration of Trust in whole or in part, and amend it from time to time in any respect.

The Settlor shall have the full right and authority at any time, by an instrument in writing delivered to the Trustee, to revoke this Declaration of Trust, in whole or in part, and to alter, amend, or modify any of the terms or provisions of this Declaration of Trust in any way and to any extent that the Settlor may determine to be desirable, subject to the limitations set forth in ARTICLES FOUR and FIVE.  This reserved power shall include, but not be limited to, the right and authority to direct the Trustee to make payment(s) to the Settlor out of the principal of the Trust Property and the right and authority to withdraw any part, or the whole, of the Trust Property from this Declaration of Trust at any time.

*[The remainder of this page intentionally left blank.]*

Upon delivery by the Settlor to the Trustee of any such written instrument, and with the Trustee's consent when required as hereinafter provided, this Declaration of Trust shall be deemed to have been revoked, altered, amended, or modified in the manner and to the extent set forth in said written instrument. In no event shall any such amendment or modification alter the duties of the Trustee without the expressed written consent of the Trustee first had and obtained.

IN WITNESS WHEREOF, Levering Russell Cartwright has executed this Amended and Restated Declaration of Trust and has hereunto affixed his signature as Settlor at South Bend, Indiana, this 5th day of June, 2018.

_____          _____
Levering Russell Cartwright, *Settlor*          Levering Russell Cartwright, *Trustee*

STATE OF INDIANA                    )
                                    ) SS:
ST. JOSEPH COUNTY                   )

Before me, a Notary Public in and for said County and State, personally appeared the within named Levering Russell Cartwright, who acknowledged execution of the above and forgoing Amended and Restated Revocable Trust to be his voluntary act and deed.

WITNESS, my hand and Notarial Seal this 5th day of June, 2018.

CHRISTOPHER POTTS
St. Joseph County
My Commission Expires
September 11, 2024

Notary Signature: _____

Notary Printed Name: Christopher Potts _____

**Document Prepared by:**
Christopher Potts (#6428-71)
Attorney at Law
218 W. Washington St., Suite 550
South Bend, Indiana  46601
(574) 234-2126
pottslawoffice@sbcglobal.net

16

FOURTEENTH AMENDED AND RESTATED
LEVERING RUSSELL CARTWRIGHT
1993-2 TRUST

EXHIBIT "A"
LISTING OF TRUST PROPERTY

Levering Russell Cartwright, Settlor of the FOURTEENTH AMENDED AND
RESTATED LEVERING RUSSELL CARTWRIGHT 1993-2 TRUST does hereby
transfer, set over, and assign to Levering Russell Cartwright, designated Trustee of such
Trust, the following listed property, to be held, managed, and distributed by the Trustee in
accordance with the terms and provisions of the Fourteenth Amended and Restated
Declaration of Trust executed by me on the 5th day of June, 2018:

All assets presently titled in the name of the LEVERING RUSSELL
CARTWRIGHT 1993-2 TRUST, as amended and restated.

Executed at South Bend, Indiana, this 5th day of June, 2018.

Levering Russell Cartwright, *Settlor*

17

## FOURTEENTH AMENDED AND RESTATED
## LEVERING RUSSELL CARTWRIGHT
## 1993-2 TRUST

### EXHIBIT "B"
### LISTING OF TRUST PROPERTY

Levering Russell Cartwright, designated Trustee of the FOURTEENTH AMENDED AND RESTATED LEVERING RUSSELL CARTWRIGHT 1993-2 TRUST, being familiar with the terms and provisions set forth in said Declaration of Trust, hereby accepts designation as Trustee of such Trust and states and declares that he will faithfully discharge the duties of his Trust according to the terms of said Amended and Restated Declaration of Trust and the laws of the State of Indiana.

Executed at South Bend, Indiana, this 5th day of June, 2018.

Levering Russell Cartwright, *Settlor*

18

# EXHIBIT D

# DURABLE POWER OF ATTORNEY

I, LEVERING RUSSELL CARTWRIGHT, of South Bend, Indiana, do hereby make, constitute and appoint JASON A. CICHOWICZ as my true and lawful attorney-in-fact, for me and in my name and place, to hold, manage and control all real and personal property now owned or hereafter acquired by or for me, and to do all things deemed by my attorney-in-fact to be necessary or desirable to protect my interests, including but not limited to, the following:

1. **Real Property**. To engaged in real property transactions pursuant to Indiana Code 30-5-5-2, which is hereby incorporated by reference;
2. **Tangible Personal Property**. To engage in tangible personal property transactions pursuant to Indiana Code 30-5-5-3, which is hereby incorporated by reference;
3. **Securities**. To engage in bond, share and commodity transactions pursuant to Indiana Code 30-5-5-4, which is hereby incorporated by reference;
4. **Retirement Plans**. To exercise general authority with respect to retirement plans pursuant to Indiana Code 30-5-5-4.5, which is hereby incorporated by reference;
5. **Banking**. To engage in banking transactions pursuant to Indiana Code 30-5-5-5, which is hereby incorporated by reference;
6. **Business Operating**. To engage in business operating transactions pursuant to Indiana Code 30-5-5-6, which is hereby incorporated by reference;
7. **Insurance**. To engage in insurance transactions pursuant to Indiana Code 30-5-5-7, which is hereby incorporated by reference;
8. **Transfer on Death Transfers**. To engage in all transfer on death transfers pursuant to Indiana Code 30-5-5-7.5, which is hereby incorporated by reference;
9. **Beneficiary**. To engage in beneficiary transactions pursuant to Indiana Code 30-5-5-8, which is hereby incorporated by reference;
10. **Gifts**. To engage in gift transactions pursuant to Indiana Code 30-5-5-9, which is hereby incorporated by reference;
11. **Fiduciary**. To engage in fiduciary transactions pursuant to Indiana Code 30-5-5-10, which is hereby incorporated by reference;
12. **Claims and Litigation**. To engage in claims and litigation transactions pursuant to Indiana Code 30-5-5-11, which is hereby incorporated by reference;
13. **Family Maintenance**. To engage in family maintenance transactions pursuant to Indiana Code 30-5-5-12, which is hereby incorporated by reference;
14. **Military Service Benefits**. To exercise general authority on my behalf with respect to benefits from military service pursuant to Indiana Code 30-5-5-13, which is hereby incorporated by reference;
15. **Records, Reports and Statements**. To exercise general authority with respect to records, reports and statements pursuant to Indiana Code 30-5-5-14, which is hereby incorporated by reference;

16. **Estate Transactions.** To engage in estate transactions pursuant to Indiana Code 30-5-5-15, which is hereby incorporated by reference;

17. **Health Care.** To exercise general authority with respect to health care pursuant to Indiana Code 30-5-5-16, which is hereby incorporated by reference;

18. **Consent To or Refusal of Health Care.** To exercise general authority with regard to consent or refusal of Health Care pursuant to Indiana Code 30-5-5-17;

   a. I LEVERING RUSSELL CARTWRIGHT authorize my healthcare representative to make decisions in my best interest concerning withdrawal or withholding of health care. If at any time based on my previous expressed preferences and the diagnosis and prognosis my health care representative is satisfied that certain health care is not and would not be beneficial or that such health care is or would be excessively burdensome, then my health care representative may express my will that such health care be withheld or withdrawn and may consent on my behalf that any and all heath care be discontinued or not instituted, even if death may result. My health care representative must try to discuss this decision with me. However, if I am unable to communicate, my health care representative may make such a decision for me, after consultation with my physician or physicians and other relevant health care providers. To the extent appropriate, my health care representative may also discuss this decision with my family and others to the extent they are available.

   Levering Russell Cartwright

19. **Delegation of Authority.** To delegate in writing to one (1) or more persons any of the powers granted to the attorney-in-fact under this instrument, pursuant to Indiana Code 30-5-5-18, which is hereby incorporated by reference;

20. **Levering Russell Cartwright 1993-2 Trust** – To engage in transactions of my trust including but not limited to buying and selling of trust property; transferring trust property; exchanging trust property. In the event that I become physically or mentally incompetent as determined by a court order or a "Certificate of Incapacity" has been issued by a physician I specifically grant my attorney-in-fact, Jason A. Cichowicz the authority to revoke, amend or modify my Declaration of Trust.

   Levering Russell Cartwright

21. **All Other Matters.** To generally transact any and all business for me of any kind or nature whatsoever, to do and perform each and every act and this whatsoever necessary or appropriate to be done in all matters affecting my business or property, and with the same force and effect as though I were personally present and acting for myself; and to have general authority over all

other matters pursuant to Indiana Code 30-5-5-19, which is hereby incorporated by reference. I hereby ratify and confirm all that my said attorney-in-fact shall do by virtue hereof.

This power of attorney shall not be affected by my subsequent disability or incapacity, or by lapse of time. If proceedings for the protection of my person or estate are brought subsequent to my execution of this durable power of attorney, I then nominate and request appointment of JASON A. CICHOWICZ, as the guardian of my person and estate.

A photo static copy of this power of attorney, as executed, given by me or my said attorney-in-fact to any third party, shall be conclusive as to such third party as to the authority of my said attorney-in-fact to act for me as provided herein, unless and until such third party shall have received written notice from me, from a court-appointed guardian or my person and estate, or from said attorney-in-fact, of the revocation or limitation of this power of attorney

**IN WITNESS WHEREOF,** I, LEVERING RUSSELL CARTWRIGHT, have hereunto set my hand on this 18th day of January, 2018.


_____
LEVERING RUSSELL CARTWRIGHT

STATE OF INDIANA                                                    )
                                                                   )SS:
ST. JOSEPH COUNTY                                                  )

     Before me, a Notary Public, personally appeared LEVERING RUSSELL CARTWRIGHT, who acknowledged the free and voluntary execution of the above and foregoing Durable Power of Attorney on the 18th day of January, 2018.



Signed: _____

Ami Axe Notary Public
Resident of St. Joseph County, Indiana

My Commission Expires on: July 31, 2024

This instrument was prepared by JASON A. CICHOWICZ, attorney at law, 110 South Taylor, South Bend, Indiana 46601.

# EXHIBIT E

| | |
|---|---|
| **TO:** | BANK OF AMERICA – PRIVATE BANK |
| **FROM:** | L. RUSSELL CARTWRIGHT |
| **SUBJECT:** | OUTGOING TRANSFER/GIFT REQUEST – ACCOUNT: ███████ |
| **CC:** | |

I am requesting that all assets in account ███████ be transferred in kind to:

Firm Name: LPL Financial LLC.

DTC Clearing: # ████

For Further Credit to LPL Account # ██████

For Further Credit To LPL Account Name: Jason Cichowicz

I fully understand I am requesting a change of beneficial owner and therefore I confirm that I relinquish all rights thereto. I am also attaching another form in the event this letter of instruction isn't sufficient. If you should have any questions, you can call either myself at: ███████ or Jason Cichowicz at ███████.

_signature_

L. Russell Cartwright

12/20/20

Dated

Outgoing Transfer /Gifting Request

Account Number ████████

---

**1. Delivering Account Information**

Account registration

| L Russell Cartwright Co-Trustees - L Russell Cartwright 1993-2 Trust |

Social Security/Tax ID number

████████

---

**2. Delivery Information**

Destination: (X) Another Firm or Financial Institution  ◯ Transfer Agent

Type of Delivery (must select one):  ◯ Charitable Gift  (X) Gift  ◯ Common Owner  ◯ Death Distribution (Tax Lot selection not available)

Charitable Gift = Delivery of assets to charitable organization (Cost basis stepped up to fair market value on settlement date)
Gift = Delivery of assets for person(s)/entity for purposes of gifting or a change of beneficial owner
Common Owner = Delivery to the same person(s)/entity, or beneficial owner
Death Distribution = Delivery to a person(s)/entity due to death

---

**3. Authorization:** I Hereby authorize Bank of America - Private Bank to act on my behalf in accordance with the following delivery instructions.

<u>Cost Basis Information:</u> use the optional (*) Tax Lot Trade Date and Tax Lot Price fields to select specific lots. If these fields are NOT specified, LPL will deliver the securities using the default first in, first out (FIFO) method.

<u>For Mutual Funds:</u> A fund account number must be established at the fund company prior to submitting this form, except when receiving account is established at a brokerage firm.

<u>Please deliver "in kind" the following security(ies):</u>

| Share Quantity | CUSIP/ Symbol | Security Description | Tax Lot Trade Date* | Tax Lot Price* (per share) | Receiving Fund Account Number |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

**3. Authorization** (continued)

**Securities:  Please deliver "in kind" the following security(ies):**

| Share Quantity | CUSIP/ Symbol | Security Description | Tax Lot Trade Date* | Tax Lot Price* (per share) | Receiving Fund Account Number |
|---|---|---|---|---|---|
| | | | | | |

---

**4. Receiving Account Information**

Receiving account registration

Jason Cichowicz

Relationship to owner (Note: Request is subject to LPL's FIU/fraud prevention policies)

Friend

| Firm name | DTC # (4 Digits) | Receiving account number |
|---|---|---|
| LPL Financial LLC. | ▇▇▇ | ▇▇▇▇ |

---

**5. For transfer requests of change of beneficial owner, I hereby confirm that I relinquish all rights thereto.**

| _(signature)_ | L Russell Cartwright | 12/30/20 |
|---|---|---|
| Account Holder Signature   (L. Russell Cartwright) | Account Holder Name (print) | Date |

| | | |
|---|---|---|
| Account Holder Signature | Account Holder Name (print) | Date |