UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BANK OF AMERICA, N.A., et al., <br><br>     Plaintiffs, <br><br>     v. <br><br> LEVERING RUSSELL CARTWRIGHT, et al., <br><br>     Defendants. | CASE NO. 3:21-CV-184-DRL-MGG |

**REPORT AND RECOMMENDATION**

On January 31, 2022, Defendant Levering Russell Cartwright filed his Verified Motion to Enforce Settlement. [DE 116]. Mr. Cartwright's Motion to Enforce became ripe after Plaintiffs Bank of America, N.A. ("BANA"), Michael Fantasia, and Shelton Heaver (collectively "the BANA Parties") filed their response [DE 124]. Mr. Cartwright did not file a reply brief, *see* N.D. Ind. L.R. 7-1(d)(3)(B), and to ensure a complete record on the merits of his Motion to Enforce, the Court afforded Mr. Cartwright one final opportunity to file a reply brief in support of his Motion to Enforce. [DE 130]. Yet, Mr. Cartwright filed nothing. The Motion to Enforce is now ripe for a decision on its merits.

Related to the Motion to Enforce are BANA's two Motions to Seal the Motion to Enforce itself and BANA's response to it as well as a request to strike a status report filed by Mr. Cartwright on December 6, 2021, all based on similar confidentiality grounds. Mr. Cartwright responded to BANA's request to strike and one of the motions to seal making all three matters ripe and ready for resolution.

On February 2, 2022, Mr. Cartwright's Motion to Enforce was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and N.D. Ind. L.R. 72-1. [DE 118]. As discussed below, the undersigned recommends that Mr. Cartwright's Motion to Enforce be denied and BANA's motions to seal and request to strike be granted in part.

I.     **RELEVANT BACKGROUND**[1]

The parties began discussing a potential resolution of all claims pending in this consolidated action during the summer of 2021. In anticipation of settlement negotiations, BANA's counsel sent a letter to counsel for Mr. Cartwright, former Defendant Jason A. Cichowicz, and former Defendants/Cross-Claimants Anne Russell Redhead and Charles Cartwright[2] on August 30, 2021, outlining topics, including mutual releases, confidentiality, non-disparagement, and indemnification provisions, that would "need to be addressed at any mediation or other settlement discussion[]." [DE 124-1 at 8]. Via email on September 9, 2021, BANA presented a settlement offer to opposing counsel that included "full releases and indemnity" for BANA. [*Id.* at 12].

The parties then agreed to mediate and retained the services of Mediator Kathy L. Seidel of JAMS Denver. On November 16, 2021, the parties mediated in South Bend, Indiana after executing JAMS' standard mediation agreement, which included a confidentiality provision ("the JAMS Agreement"). By the end of the 10-hour day of

---

[1] The following facts are largely taken from BANA's brief in response to Mr. Cartwright's Motion to Enforce [DE 124] and attached exhibits, which Mr. Cartwright has not rebutted.
[2] Cichowicz, Redhead, and Charles Cartwright were dismissed from this action on September 1, 2021. [DE 91]. Nevertheless, they participated in the mediation at issue in this case. [DE 124-1 at 3].

2

mediation, the parties had agreed to three or four substantive terms, including one related to the release terms for Mr. Cichowicz but without discussion of provisions for confidentiality, non-disparagement, or indemnification. At the end of the session, BANA volunteered to draft a settlement agreement to guide continued discussions in coming days. Mediator Seidel also agreed to be part of the parties' ongoing efforts.

The day after the mediation session, BANA's counsel circulated a draft settlement agreement and invited edits, which Mr. Cartwright's counsel provided via email on November 19th. The parties continued discussing the draft agreement until their disagreement as to whether a final settlement had been reached at the mediation session interfered. On November 23rd, Ms. Seidel interjected amidst the parties' email communications stating that the parties had indeed "reached some major settlement terms" on the 16th, but that "many details [were] still to be hammered out," which was clear to her on the 16th. [*Id.* at 26]. The parties continued to work toward a settlement until December 3, 2021, when Ms. Seidel informed the parties that they had reached an impasse and that her involvement in the matter had concluded. [*Id.* at 30].

In a December 6, 2021, status report, Mr. Cartwright, Mr. Cichowicz, and the Cartwright Foundation[3] informed the Court that "[a]fter a ten (10) hour mediation the case was settled in its entirety subject to the usual releases being executed." [DE 100 at 1, ¶ 2]. They then stated that BANA had "inserted indemnification language that substantively change[d] the agreement . . . reached on November 16, 2021 [and] created

---

[3] Mr. Cichowicz and the Cartwright Foundation were signatories to the status report despite being dismissed from this case by a Court order dated September 9, 2021. [DE 91].

3

[an] inability for the parties to sign final settlement documents." [*Id.*, ¶¶ 3–4]. The BANA Parties' separate status report on the same day simply stated that "[t]he parties did not reach settlement" then proposed a plan for re-starting discovery. [DE 101 at 1–3]. BANA also alleged that the Cartwright status report violated the JAMS Agreement and asked that the status report be stricken. [*Id.* at 3].

On December 7, 2021, this Court lifted the stay of discovery that had been entered at the parties' request to facilitate mediation and directed the parties to finalize the pleadings and work together to present a proposed case management plan to the Court. [DE 102]. The Court also allowed Mr. Cartwright to respond to BANA's request to strike his status report, which he timely did on December 17, 2021. On January 24, 2022, Mediator Seidel filed her Report to the Court indicating that "[n]o agreement was reached on any matter" despite mediation efforts since November 16, 2021. [DE 110].

With the Court's permission, Mr. Cartwright filed the instant Motion to Enforce arguing the parties reached an enforceable oral settlement agreement at the mediation session. BANA's request to strike and motions to seal seek enforcement of the confidentiality provision in the JAMS Agreement and applicable ADR and evidentiary rules with regard to the filings in this Court regarding the mediation session.

II.   ANALYSIS

  A.   Mr. Cartwright's Motion to Enforce

"Courts retain the inherent power to enforce agreements entered into in settlement of litigation which is pending before them." *Silkey v. Invs. Diversified Servs., Inc.*, 690 N.E.2d 329, 332 (Ind. Ct. App. 1997), *disapproved of on other grounds by Vernon v.*

4

*Acton*, 732 N.E.2d 805 (Ind. 2000). Generally, state law determines the enforceability of settlement agreements based upon ordinary state law contract principles. *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 490 (7th Cir. 2002); *cf. Dillard v. Starcon Intern, Inc.*, 483 F.3d 502, 506 (7th Cir. 2007) (citing *Lynch* and its reliance upon *Kokkenen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380–82 (1994), "which established that a settlement of a federal claim is enforced 'just like any other contract' under the state of law of contracts, 'unless it is embodied in a consent decree or some other judicial order or unless jurisdiction to enforce the agreement is retained.'"). Indiana's ADR Rules also govern mediation processes in this Court. N.D. Ind. L.R. 16-6(c).

"Indiana strongly favors settlement agreements and if a party agrees to settle a pending action, but then refuses to consummate his settlement agreement, the opposing party may obtain a judgment enforcing the agreement." *MH Equity Managing Member, LLC v. Sands*, 938 N.E.2d 750, 757 (Ind. Ct. App. 2010) (citing *Georgos v. Jackson,* 790 N.E.2d 448, 453 (Ind. 2003)). Under contract principles, the existence of a settlement agreement is a question of law answered through analysis of the contractual elements of offer, acceptance, consideration, and a meeting of the minds or intent to contract. *Id.* The parties' intent to contract is a factual matter determined based upon the totality of circumstances—especially the parties' outward manifestations of their intent. *Id.*; *see also Billingsley v. Hoffman*, Cause No. 1:09-cv-274, 2011 WL 38983, at *2 (N.D. Ind. Jan. 5, 2011).

Here, BANA argues first that any settlement agreement arising from the parties' November 2021 mediation cannot be enforced because it was not reduced to writing

and signed by all parties. Second, BANA contends that no agreement exists to enforce because there was never a meeting of the minds on all essential terms.

### 1. ADR Rule 2.7(E)(2) Writing and Signature Requirement

BANA contends that Ind. A.D.R. Rule 2.7(E)(2) requires mediated settlements to be in writing and signed to be enforceable. Undisputedly, the alleged settlement agreement that Mr. Cartwright is asking this Court to enforce was not reduced to writing or signed.

As relevant here, ADR Rule 2.7(E)(2) provides that "[i]f an agreement is reached, in whole or in part, it shall be reduced to writing and signed by the parties and their counsel." According to BANA, Rule 2.7(E)(2) prevents enforcement of oral mediated settlement agreements regardless of the state law of contracts, which does not foreclose enforcement of oral settlement agreements generally. *See Dillard*, 483 F.3d at 506; *Lynch, Inc.*, 279 F.3d at 490. Yet the effect of Rule 2.7(E)(2)'s writing and signature requirements on the enforceability of oral mediated settlement agreements is not clearly developed in Indiana law. *See* 2:7.80 *Enforcement of Mediated Agreements*, 4B Ind. Prac., Rules on ADR Ann. With Forms (2021 ed.) (tracing caselaw regarding oral mediated settlement agreements and suggesting that the law of admissibility of such agreements is clearer than the law of enforceability).

In *Silkey v. Investors Diversified Service, Inc.*, for instance, state contract law was applied to enforce an unsigned settlement agreement. 690 N.E.2d 329. Subsequently, the *Vernon* court held that "[u]ntil reduced to writing and signed by the parties, mediation settlement agreements must be considered compromise settlement negotiations under

the applicable A.D.R. Rules and Evidence Rule 408," followed by a footnote stating that "[t]o the extent that *Silkey*, 690 N.E.2d 329, holds to the contrary, it is disapproved." 732 N.E.2d at 810. While *Vernon* does not speak directly to the enforceability of an oral mediated settlement agreement or the applicability of state contract law to oral mediated settlement agreements, the vague disapproval language in the footnote leaves open the question of whether *Vernon*'s holding only on the admissibility of oral settlement agreements is sufficient to preclude enforceability of oral mediated settlement agreements under Rule 2.7(E)(2). Nevertheless, courts have used *Vernon* as support for finding oral mediated settlement agreements unenforceable. *See, e.g.*, *McKinney v. Grant Cnty. Sheriff*, Cause No. 1:20-CV-151-HAB, 2022 WL 581008, at *2 (N.D. Ind. Feb. 25, 2022) (discussing *Vernon* then finding that an oral agreement at the close of a mediation was not binding under Rule 2.7(E)(2)); *Spencer v. Spencer*, 752 N.E.2d 661, 665 (Ind. Ct. App. 2001) (relying largely, but not completely, on *Vernon* to conclude that "the trial court incorrectly granted Husband's Motion to Enforce Agreement because the alleged agreement had not been reduced to writing, signed by the parties, and approved by the trial court."[4]); *Id.* (Friedlander, J., concurring) (citing ADR Rule 2.7(E)(2) as the only necessary support for finding no enforceable property settlement agreement existed in the domestic relations matter).

Yet ADR Rule 2.7(E)(2)'s effect on the enforceability of oral mediated settlement agreements, largely driving the parties' arguments, is immaterial here. The writing and

---

[4] *Spencer* is a marriage dissolution case also governed by the writing, signature, and approval requirements sets forth in Ind. Code § 31-15-2-27. *See* 752 N.E.2d at 663.

7

signature requirement of Rule 2.7(E)(2) begins with the phrase "[if] an agreement is reached . . . ." Thus, its application is expressly predicated on the existence of an agreement arising from a mediation. As will be shown below, Mr. Cartwright has not established that any such agreement ever existed.

### 2. Existence of Any Agreement to Enforce

Mr. Cartwright contends that the parties reached agreement as to essential terms of a settlement by the close of the mediation session on November 16, 2021. In support, Mr. Cartwright relies upon his instant Verified Motion to Enforce, reflecting his attorney's recollection of the mediation session. Specifically, the Verified Motion outlines the parties' path to agreement on three or four substantive matters during the November 16th session. The Verified Motion also suggests that four other attorneys would concur but does not identify those attorneys or what they might aver if asked.

In his response to BANA's request to strike his December 2021 status report, Mr. Cartwright also identified Mediator Seidel as a witness who would "confirm that complete and final terms of settlement were agreed to, and that indemnification was never discussed at all as a term of settlement." [DE 104 at 3]. Mr. Cartwright then argued that BANA's assent to the settlement agreement was evident by its prompt reduction of the mediation session to writing the next day. BANA agrees that the parties did, in fact, reach agreement on certain substantive terms of settlement during the November 2021 mediation session. However, BANA presents evidence showing that those terms were not and could not have been the totality of a valid, enforceable settlement agreement.

8

First, BANA documents communications related to settlement discussions between the parties' attorneys starting in August 2021. In the August 30th letter to Mr. Cartwright's counsel, BANA's counsel outlined "topics that [BANA] believes will need to be addressed at any mediation or other settlement discussions." [DE 124-1 at 8]. In specifying those topics, BANA's counsel referred explicitly to "mutual releases, as well as standard settlement terms, such as confidentiality and non-disparagement [and] indemnification of the Bank . . . ." [*Id.*]. BANA's attorney also attested to and documented his September 9, 2021, email to Mr. Cartwright's counsel referencing BANA's willingness to accept a settlement agreement "in which the Bank receives full releases and indemnity" in addition to other specific terms. [*Id.* at 12]. From these two communications alone, Mr. Cartwright knew, or should have known, before arriving at the November 16th mediation session about BANA's expectations for release and indemnification provisions beyond any substantive terms of settlement. As such, Mr. Cartwright should have known that the agreements at the mediation session did not and could not reflect all the terms BANA required.

Second, BANA presents communications after the November mediation from which it is easy to infer that Mr. Cartwright understood that an agreement had yet to be reached. In a joint status report filed with this Court on November 23, 2021—a week after the mediation session—Mr. Cartwright and BANA described the state of their mediation stating: "The parties are still negotiating the terms of the release and other matters." [DE 98 at 1]. Without a complete agreement on November 23rd, there could not have been a complete agreement on November 16th. Moreover, by acknowledging

9

that the parties did not have a meeting of the minds as to the release and other matters, Mr. Cartwright implied his understanding that the provisions for releases and other matters were critical, mandatory terms from BANA's perspective.

Third, BANA cites three statements by Mediator Seidel that contradict Mr. Cartwright's statement that she would confirm that an agreement was reached on November 16th. On November 23, 2021, as part of counsel's email exchange preparing the joint status report later filed with the Court, Ms. Seidel acknowledged that "some major settlement terms" had been reached at the mediation session but that it was evident at the end of the mediation session that "[t]here were many details still to be hammered out . . . ." [DE 124-1 at 26]. This statement is not consistent with Mr. Cartwright's expectation that Ms. Seidel would confirm that an agreement had been reached. Additionally, in her email to counsel on December 3, 2021, Ms. Seidel clearly stated that "[t]he parties are at an impasse." [*Id.* at 30]. She concluded by filing a clear, simple report of mediation with this Court on January 24, 2022, saying: "No agreement was reached on any matter." [DE 110]. Mr. Cartwright presents nothing to overcome Ms. Seidel's strong statements affirming that no agreement was ever reached and specifically that no agreement was reached at the November 16th mediation session.

Fourth, Mr. Cartwright's inference that a settlement agreement must have occurred at the November 16th mediation session because BANA drafted a written agreement for review the next day does not follow from the facts of record here. As BANA notes, and Mr. Cartwright has not disputed, the Cartwright contingent left the mediation session first—before the BANA contingent and before Mediator Seidel. As a

result, Mr. Cartwright was not privy to conversations between the BANA Parties and Ms. Seidel in which they discussed, but decided against, moving the session to another South Bend location when their first location closed and BANA's offer to keep negotiations progressing by drafting an agreement for the parties' ongoing review.

In light of BANA's evidence, which Mr. Cartwright has not rebutted despite being offered two opportunities to do so[5], no meeting of the minds was reached at the end of the November 16th mediation session, or anytime thereafter, as to the entirety of terms necessary for a settlement agreement between the parties. Without an agreement between the parties, there is nothing for this Court to enforce. Accordingly, the undersigned recommends that the Court deny Mr. Cartwright's Motion to Enforce.

### B. Confidentiality of Mediation Communications

BANA challenges Mr. Cartwright's use of settlement-related communications between the parties, particularly during the November 2021 mediation session discussed above, in filings before this Court seeking to enforce the alleged settlement agreement. In support of its requests to strike Mr. Cartwright's December status report [DE 100] and to seal his Motion to Enforce [DE 116] and its own response to the Motion [DE 124], BANA argues that all three filings contain "confidential and inadmissible information pursuant to the terms of the parties' agreement for mediation and under Federal Rule of Evidence 408." [DE 117 at 2; *see also* DE 101 at 3; DE 123 at 1].

---

[5] Undeveloped arguments are waived. See *United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017).

Before sealing any court filing, a court must determine whether good cause exists to maintain any part of the record under seal because it is in the public interest to keep court proceedings publicly accessible. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944 (7th Cir. 1999). Federal Rule of Evidence 408 makes conduct or statements made during compromise negotiations inadmissible under most circumstances. Similarly, Indiana ADR Rule 2.11 provides that mediations sessions are generally confidential and inadmissible. And as already discussed above, oral mediated settlement agreements are considered inadmissible "compromise settlement negotiations" under the ADR Rules and Evidence Rule 408." *Vernon*, 732 N.E.2d at 810. Arguably, these rules provide the good cause necessary to protect the parties' settlement negotiations and communications here from public disclosure.

Yet, "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view." *Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013) (internal quotations omitted). "[T]he presumption of public access 'applies only to the materials that formed the basis of the parties' dispute and the . . . court's resolution'; other materials that may have crept into the record are not subject to the presumption." *Id.* (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002). "[F]or the most part settlement terms are of potential public interest only when judicial approval of the terms is required, or they become an issue in a subsequent lawsuit, or the settlement is sought to be enforced". *Id.* at 834. Thus, public access to a settlement agreement is dependent upon whether it would "reveal anything about judicial activity." *Id.*

12

Here, Mr. Cartwright has made the alleged settlement agreement an issue before this Court with his motion to enforce it. However, Mr. Cartwright's Motion decided without any substantive analysis of the terms of the agreement or details of their settlement communications. Rather, references to only general, almost generic, topics in the parties' communications amongst themselves and with Mediator Seidel before and after the November mediation session became the basis of the recommended conclusion that no settlement agreement existed to be enforced. No specific negotiations related to the common issues of releases, confidentiality, non-disparagement, or indemnification needed to be analyzed to ascertain whether a meeting of the minds existed. Accordingly, public disclosure of the alleged settlement agreement or the accompanying negotiations and communications is not necessary to reveal anything about judicial action on Mr. Cartwright's Motion to Enforce.

Moreover, all the parties involved in the November 2021 mediation, including Mr. Cartwright and his counsel, undisputedly signed the JAMS Agreement, which prohibits disclosure of settlement communications[6]. Enforcing the JAMS Agreement is

---

[6] The Agreement's Confidentiality provision provides:
> All communications, whether oral or written, made in the course of the mediation process by any of the parties, their agents, employees, experts and attorneys, and by the mediator and JAMS employees, are confidential by agreement and the Colorado Dispute Resolution Act, C.R.S. 13-22-301, et. seq. Offers, promises, conduct, and statements will not be disclosed to third parties, except disclosed persons associated with the participants in the process that are similarly bound to keep the communications confidential. Mediation communications are privileged and inadmissible for any purpose, including impeachment, under Rule 408 of the Federal Rules of Evidence and any applicable federal or state statute, rule or common law provisions. However, evidence previously disclosed or known to a party, or that is otherwise admissible or discoverable shall not be rendered confidential, inadmissible or not discoverable solely as a result of its use in the mediation.

[DE 101-1 at 2–3].

13

consistent with evidentiary principles espoused in Fed. R. Evid. 408 and with general contract principles. Nothing in the record suggests that the JAMS Agreement was not a valid agreement or that the parties should not otherwise be held to its terms.

Therefore, BANA has demonstrated good cause to protect Mr. Cartwright's December 2021 status report, the Verified Motion to Enforce, and its response to the Motion to Enforce from public disclosure to the extent they reveal details of the parties' mediation and settlement negotiations and communications. BANA has not shown, however, that Mr. Cartwright's December 2021 status report is sufficiently redundant, immaterial, impertinent, or scandalous to warrant striking it entirely from the record. *See* Fed. R. Civ. P. 12(f).

Accordingly, the undersigned recommends that BANA's request to strike Mr. Cartwright's Status Report be granted in part [DE 101] and that BANA's motions to seal Mr. Cartwright's Verified Motion to Enforce and its own response to the Motion to Enforce be granted to the extent detailed above. [DE 117, DE 123]. If this recommendation is adopted, the parties should be directed to file redacted versions of the documents at issue, preferably jointly. Additionally, nothing in this report and recommendation suggests that the parties should be precluded from requesting, or that the Court is precluded from, unsealing any or all the redacted information as this case proceeds into its final stage.

### C.     Imposition of Costs

Citing Indiana's General Recovery Rule statute, Mr. Cartwright requests an award of attorney fees related to his Motion to Enforce. The recovery rule provides for

an award of attorney's fees "as part of the cost to the prevailing party, if the court finds that either party . . . continued to litigation the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or litigated the action in bad faith." Ind. Code § 34-52-1-1(b)(2)–(3). At a minimum, Mr. Cartwright did not prevail on his Motion to Enforce leaving no need for further analysis of the applicability of the statute to this circumstance or BANA's conduct related to the mediation.

BANA, however, contends that it should be awarded its fees and expenses for responding to Mr. Cartwright's Motion to Enforce alleging that the Motion "objectively fails to comply with Federal Rule of Civil Procedure 11(b)." [DE 124 at 23]. Sanctions under Fed. R. Civ. P. 11(b) are a rarity. *Aaron, MacGregor & Assocs., LLC v. Zheijiang Jinfei Kaida Wheels Co.*, No. 3:15-CV-254-MGG, 2017 WL 4875904, at *4 (N.D. Ind. Oct. 30, 2017). Consideration of Rule 11(b) sanctions requires a fact-intensive inquiry of all circumstances of a case. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990). Therefore, district judges must "reflect seriously, and consider fully, before imposing (or denying) sanctions." *II Ltd. v. English*, 217 Fed. App'x 527, 529 (7th Cir. 2007) (citing *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 936 (7th Cir. 1989)).

Here, BANA essentially argues that Mr. Cartwright's Motion to Enforce was frivolous but does not develop facts to show that Rule 11(b) sanctions—extreme as they are—should be employed in this particular situation. Therefore, the undersigned recommends that the parties here be held responsible for their own expenses and attorneys' fees related to the Motion to Enforce. *Cf. River Ridge Dev. Auth. v. Outfront Media, LLC*, 146 N.E.3d 906, 912 (Ind. 2020) ("The general rule in Indiana, and across the

country, is that each party pays its own attorney's fees; and a party has no right to recover them from the opposition unless it first shows they are authorized.")

**III.   CONCLUSION**

For the reasons discussed above, the undersigned **RECOMMENDS** that the Court

(1)    **DENY** Mr. Cartwright's Motion to Enforce Settlement Agreement [DE 116], including requests from both sides for an award of expenses and fees related to the Motion; and

(2)    **GRANT IN PART** BANA's request to strike [DE 101] and Motions to Seal [DE 117, DE 123] and **ORDER** redactions as detailed above.

> **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

Upon resolution of this Report and Recommendation, the undersigned will issue additional orders, as necessary, to establish revised case management deadlines consistent with the dictates of Fed. R. Civ. P. 1.

**SO ORDERED** this 6th day of September 2022.

s/Michael G. Gotsch, Sr.<br>
Michael G. Gotsch, Sr.<br>
United States Magistrate Judge